THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DAVID DENSON, Defendant-Appellant.

Second District   No. 2—91—0125

Opinion filed September 7, 1993.

Theodore Gottfried, of State Appellate Defender's Office, of Springfield, and Kathleen T. Zellner, of Kathleen T. Zellner & Associates, of Naperville, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE QUETSCH delivered the opinion of the court:

Defendant, David Denson, appeals from an order of the circuit court of Lake County denying his petition under the Post-Conviction Hearing Act (725 ILCS 5/122—1 et seq. (West 1992)). The issues presented for review are: (1) whether decisions invalidating certain pattern jury instructions given at defendant's trial may be applied retroactively in post-conviction proceedings, and (2) whether defendant was denied the effective assistance of counsel.

Following a jury trial, defendant was convicted of two counts of murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1 (now codified, as amended, at 720 ILCS 5/9—1 (West 1992))) arising from the fatal shootings of Angela Gardner and George Coleman in Waukegan. Defendant was originally sentenced to two concurrent 40-year terms of imprisonment, but on the State's petition, the Illinois Supreme Court, in the exercise of its supervisory jurisdiction, ordered the trial court to vacate the sentence and to sentence defendant to a term of natural-life imprisonment pursuant to section 5—8—1(a)(1)(c) of the Unified Code of Corrections (730 ILCS 5/5—8—1 (West 1992)). In defendant's direct appeal, we affirmed the conviction and the sentence entered pursuant to the supreme court's order. *People v. Denson* (1985), 139 Ill. App. 3d 914, *cert. denied* (1986), 479 U.S. 837, 93 L. Ed. 2d 80, 107 S. Ct. 137.

The evidence presented at trial is set forth in detail in our opinion deciding defendant's direct appeal (*People v. Denson* (1985), 139 Ill. App. 3d 914) and need only briefly be summarized here. Defendant testified that he and Angela Gardner had begun dating in the summer of 1983. Their relationship broke off as a result of defendant's involvement with another woman, Sharon Daniels, with whom

defendant had a child. After their relationship ended under these circumstances, Gardner began spreading rumors that defendant had raped her and had stolen $2 from her. Gardner was connected in some way to the Vice Lords street gang and, in fact, had a gang insignia tattooed on her arm. Defendant testified that on several occasions prior to the shootings he had been accosted by groups of young men who threatened reprisals against him based on Gardner's allegations. Four or five days before the shooting, when defendant approached Gardner to talk about the situation, she told him "Now you [sic] going to get yours."

In the early evening of November 1, 1983, defendant and his friends Bernard Jedkins and Sam Jenkins were together at defendant's house. Jedkins told defendant that Gardner had arranged to have defendant beaten up and that the assailants were waiting for him. Defendant indicated that he was going to ask Gardner what was going on. They left defendant's house on foot, but returned for defendant's car, and as they were driving off, defendant saw Gardner and Coleman coming out of Ricky Allen's house. Defendant told Jedkins and Jenkins that he wanted to "find out what is happening now." Jedkins and Jenkins warned defendant that there were more people waiting for him at Allen's house.

They drove farther, and defendant parked the car, again indicating that he was going to confront Gardner. Defendant asked Jenkins and Jedkins if they would back him up if a fight occurred, but they responded that they would not. Defendant took a gun from a tool box in his car and they began walking. When he saw Gardner and Coleman, defendant walked toward them holding his gun for protection. Jedkins and Jenkins stayed behind. Defendant saw a group of five to seven young men about three houses behind Gardner and Coleman. The group included some gang members who had previously threatened revenge against defendant for raping Gardner and stealing $2 from her. When defendant was a few feet from Gardner and Coleman, Coleman said, "What is this between you and my woman?" Defendant was then struck in the mouth by some object, and his head snapped back. Defendant then shot Coleman. Gardner bent down, which scared defendant. He then shot Gardner. Defendant testified, "I was already nervous about the people down the street and I just jumped and the gun went off again." Coleman had started to run and defendant panicked and ran.

Bernard Jedkins and Sam Jenkins testified for the State. They had been at defendant's house and had discussed defendant's situation with Gardner, including their belief that Gardner had enlisted

some boys to beat defendant up. Jedkins and Jenkins both testified that during the course of the evening defendant had threatened, in essence, to beat up Gardner and had also stated that he was going to shoot Gardner in the head and was also going to shoot whoever was with her. Jenkins testified that when defendant exited his car immediately prior to the shootings, defendant said he was "going to get this bitch." Defendant jogged or ran toward Gardner and Coleman and pulled out a gun when he was about 10 to 20 feet from them. Defendant fired at Gardner and Coleman. Coleman began running and defendant ran after him. Nobody else was in the area around Coleman and Gardner when defendant approached and shot them.

Later that evening defendant contacted the Waukegan police department and voluntarily accompanied Waukegan police officers to the police station where he was interviewed by Detective Howard Pratt that same evening and by Detective Ralph Henriquez the next morning. Detective Pratt testified that defendant told him he shot Coleman at which time he panicked and shot Gardner. Defendant also told Pratt he did not know why he shot them. Detective Henriquez testified that defendant told him that he pulled his gun out "because he was very angry at Angie and wasn't thinking right."'

.Based upon the evidence presented at trial, the jury found defendant guilty of murder in the killings of Coleman and Gardner, and as noted above, we affirmed the conviction. Thereafter, on December 13, 1989, defendant filed his petition for relief under the Post-Conviction Hearing Act, contending that his right to due process was violated by the use of jury instructions which had subsequently been held invalid in *People v. Reddick* (1988), 123 Ill. 2d 184. Defendant further contended that he was deprived of the right to effective assistance of counsel at trial because of, *inter alia*, trial counsel's failure to present certain evidence bearing on defendant's state of mind at the time of the shootings. The circuit court denied the petition, and this appeal followed.

Defendant first contends that the circuit court erred in denying his request for post-conviction relief based on the use of jury instructions similar to instructions later found to be defective by the Illinois Supreme Court in *People v. Reddick* (1988), 123 Ill. 2d 184. The circuit court based its ruling on *People v. Flowers* (1990), 138 Ill. 2d 218, in which our supreme court held that its decision in *Reddick* is not to be applied retroactively to a case under consideration in a post-conviction proceeding. Defendant maintains that irrespective of the retroactivity of *Reddick* he is entitled to relief pur-

suant to Federal due process and retroactivity principles articulated by the United States Court of Appeals for the Seventh Circuit in its recent decisions in *Falconer v. Lane* (7th Cir. 1990), 905 F.2d 1129, and *Taylor v. Gilmore* (7th Cir. 1992), 954 F.2d 441, *rev'd* (1993), 508 U.S. ___, 124 L. Ed. 2d 306, 113 S. Ct. 2112.

■ After the parties submitted their briefs in this appeal, the United States Supreme Court granted *certiorari* in *Taylor* (*Gilmore v. Taylor* (1992), 506 U.S. 814, 121 L. Ed. 2d 22, 113 S. Ct. 52) and reversed the Court of Appeals' decision. (*Gilmore v. Taylor* (1993), 508 U.S. ___, 124 L. Ed. 2d 306, 113 S. Ct. 2112.) We also note that in *People v. Qualls* (1992), 233 Ill. App. 3d 394, a case decided after the briefs were filed in the case at bar, but prior to the Supreme Court's reversal of *Taylor*, we refused to follow *Taylor*, finding it in conflict with our supreme court's decision in *Flowers*. As discussed below, in view of the Supreme Court's reversal of the principal case defendant relies upon, defendant's argument finds no support in either Federal or State authority. Accordingly, we affirm the circuit court's denial of post-conviction relief requested on the basis of improper instructions.

In *People v. Reddick* (1988), 123 Ill. 2d 184, our supreme court held that the pattern jury instructions on the burden of proof for murder and voluntary manslaughter (Illinois Pattern Jury Instructions, Criminal, Nos. 7.02, 7.04, 7.06 (2d ed. 1981)), read together, were erroneous because they improperly placed on the State the burden of proving the mitigating factors which reduce the offense to voluntary manslaughter, "a burden the State, in seeking a murder conviction, would have no reason to fulfill." (*People v. Johnson* (1991), 146 Ill. 2d 109, 140.) According to the court in *Reddick*, such instructions assured that the jury could not convict the defendant of voluntary manslaughter since "even if a mitigating mental state is proved, it will have been proved by the defendant, not the People." *Reddick*, 123 Ill. 2d at 194-95.

In *People v. Flowers* (1990), 138 Ill. 2d 218, the court held that *Reddick* should not apply retroactively to a case under consideration in a post-conviction proceeding. To reach this conclusion, the court utilized the analysis developed by the United States Supreme Court in *Teague v. Lane* (1989), 489 U.S. 288, 103 L. Ed. 2d 334, 109 S. Ct. 1060, which addressed the question of retroactivity in the analogous context of Federal *habeas corpus* proceedings. Under *Teague*, "decisions establishing new constitutional rules of criminal procedure are not to be applied retroactively to cases pending on collateral review unless the new rule either (1) places certain kinds

of primary, private individual conduct beyond the power of the criminal law making authority to proscribe, or (2) requires the observance of those procedures that are implicit in the concept of ordered liberty." (*Flowers*, 138 Ill. 2d at 237, citing *Teague*, 489 U.S. at 307, 103 L. Ed. 2d at 353, 109 S. Ct. at 1073.) A case announces a new rule "when it breaks new ground or imposes a new obligation on the States or the Federal Government. [Citations.] To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." (Emphasis in original.) *Teague*, 489 U.S. at 301, 103 L. Ed. 2d at 349, 109 S. Ct. at 1070.

Our supreme court determined that *Reddick* announced a new rule within the meaning of *Teague*:

> "Though *Reddick* was doctrinally consistent with existing laws regarding affirmative defenses and burdens of proof, it was the first time this court applied these legal principles to the specific situation of the murder and voluntary manslaughter instructions. In applying these principles, not only did the court determine that the instructions were erroneous, it also ruled that, as written, they implicated constitutional rights. This conclusion did not necessarily flow from the statutory analysis. [Citation.] Also, this 'result was not *dictated* by precedent existing at the time.'" (Emphasis in original.) (*Flowers*, 138 Ill. 2d at 240, quoting *Teague*, 489 U.S. at 301, 103 L. Ed. 2d at 349, 109 S. Ct. at 1070.)

The *Flowers* court further concluded that neither of the exceptions set forth in *Teague* permitting retroactive application of new constitutional rules of criminal procedure applied. 138 Ill. 2d at 241-42.

Defendant seeks to avoid the effect of the holding in *Flowers* by relying on Federal court decisions involving constitutional challenges to the same jury instructions. Implicit in defendant's reasoning is the premise that *Reddick* was decided on State law grounds, and the retroactivity analysis in *Flowers* is correspondingly limited to nonconstitutional challenges to the murder and manslaughter instructions.

In *Falconer v. Lane* (7th Cir. 1990), 905 F.2d 1129, the United States Court of Appeals for the Seventh Circuit found these instructions to be defective, not because of improper allocation of the burden of proof, but on the separate basis that the instructions failed to apprise the jury that proof of the mitigating mental states precluded a murder conviction. (*Falconer*, 905 F.2d at 1136 ("No matter how clearly either the State or the defense proved the exist-

ence of the mitigating 'manslaughter defenses,' the jury could nevertheless return a murder verdict in line with the murder instruction as given").) Moreover, the court noted that because the murder instruction, which makes no reference to the "manslaughter defenses," appeared before the voluntary manslaughter instructions "[j]urors are *** encouraged by the structure of the instructions to answer [the murder instruction's] requirements first and then move on only if those requirements cannot be met." (905 F.2d at 1136.) The court emphasized the constitutional nature of the defect:

> "[The instructions] specifically directed the jury that it could return a verdict of murder if the State negated the self-defense theory without making any reference to evidence regarding provocation or unreasonable belief of justification. Explicit misdirection on this scale violates the constitutional guarantee of due process and demands a new trial or resentencing." 905 F.2d at 1137.

In *Taylor v. Gilmore* (7th Cir. 1992), 954 F.2d 441, *rev'd* (1993), 508 U.S. ___, 124 L. Ed. 2d 306, 113 S. Ct. 2112, the Seventh Circuit held that *Falconer* did not announce a new rule and could therefore be applied retroactively. The defendant in *Taylor* argued that both *Reddick* and *Falconer* should be applied retroactively in the context of Federal habeas corpus proceedings. The court found the retroactivity of *Reddick* to be irrelevant, however, based on the observation that *Reddick* was "grounded solely on Illinois criminal law, and we are foreclosed from granting habeas relief because a state court committed an error of state law." (954 F.2d at 448.) However, the court agreed with the defendant that *Falconer* could be applied retroactively. Applying the *Teague* test, the court identified two United States Supreme Court decisions which, in the court's view, compelled or dictated the result in *Falconer*.

First the court stated that *Falconer* was properly viewed as an application of the holding in *Boyde v. California* (1990), 494 U.S. 370, 380, 108 L. Ed. 2d 316, 328-29, 110 S. Ct. 1190, 1196, that in cases challenging the sufficiency of ambiguous jury instructions the court must ask whether there is a reasonable likelihood that the jury has applied the challenged instruction in an invalid manner. (*Taylor*, 954 F.2d at 452-53.) Although this principle had not previously been applied to the murder and manslaughter instructions at issue, the court observed that the application of the general principle to particular instructions was a "quintessentially factual determination." (954 F.2d at 453.) Thus, the court concluded, "[t]o assert that *Falconer* was new, because it was the first case to assert that

a particular set of instructions was ambiguous and susceptible to different interpretations, would obliterate the distinction between rules and their applications, and thereby contravene the principles of *Teague.*" 954 F.2d at 453.

The court also found precedent for *Falconer* in *Connecticut v. Johnson* (1983), 460 U.S. 73, 74 L. Ed. 2d 823, 103 S. Ct. 969, which, according to the court, condemned instructions that lead the jury to ignore exculpatory evidence in finding the defendant guilty of murder beyond a reasonable doubt. (*Taylor*, 954 F.2d at 453, citing *Johnson*, 460 U.S. at 84-85, 74 L. Ed. 2d at 832-33, 103 S. Ct. at 976.) Observing that the states of mind which support a manslaughter conviction are exculpatory with respect to the charge of murder, the court concluded that the instructions at issue "clearly contravene the principle advanced in *Johnson.*" (954 F.2d at 453.) Accordingly, based upon the precedential force of *Boyde* and *Johnson*, the court found that *Falconer* did not announce a "new rule" and it could therefore be applied retroactively.

In *Gilmore v. Taylor* (1993), 508 U.S. ___, 124 L. Ed. 2d 306, 113 S. Ct. 2112, the Court reversed the Seventh Circuit's decision. The Court found that neither *Boyde* nor *Johnson* dictated the result in *Falconer*. *Boyde* was inapposite, in the Court's view, because it was a capital case "with respect to which *** the Eighth Amendment requires a greater degree of accuracy and fact finding than would be true in a non-capital case." (508 U.S. at ___, 124 L. Ed. 2d at 318, 113 S. Ct. at 2117.) The Court observed, "[o]utside of the capital context, we have never said that the possibility of a jury misapplying state law gives rise to federal constitutional error." 508 U.S. at ___, 124 L. Ed. 2d at 318, 113 S. Ct. at 2117.

Similarly, the Court disagreed with the Seventh Circuit's interpretation of *Johnson*. *Johnson* elaborated on *Sandstrom v. Montana* (1979), 442 U.S. 510, 61 L. Ed. 2d 39, 99 S. Ct. 2450, which invalidated instructions that created an erroneous *presumption* on the element of intent. According to the Court:

> "*Sandstrom* is a lineal descendant of [*In re*] *Winship* [(1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068]; it simply held that an instruction which creates a presumption of fact violates due process if it relieves the State of its burden of proving all of the elements of the offense charged beyond a reasonable doubt. The Court of Appeals read the *Johnson* plurality's discussion of *Sandstrom* as establishing the 'due process principle' that instructions are unconstitutional if they lead 'the jury to ignore *exculpatory evidence* in finding

the defendant guilty of murder beyond a reasonable doubt.' [Citation] (emphasis added). But neither *Sandstrom* nor *Johnson* can be stretched that far beyond *Winship*. The most that can be said of the instructions given at respondent's trial is that they created a risk that the jury would fail to consider evidence that related to an affirmative defense, with respect to which *Winship*'s due process guarantee does not apply." *Gilmore*, 508 U.S. at ___, 124 L. Ed. 2d at 318-19, 113 S. Ct. at 2118.

The Court therefore held that *Falconer* constituted a new rule which would not be applied retroactively. (508 U.S. at ___, 124 L. Ed. 2d at 319-20, 113 S. Ct. at 2119.) Since our supreme court and the United States Supreme Court have, respectively, found that State and Federal decisions invalidating the jury instructions challenged by defendant do not apply retroactively, the court below did not err in denying post-conviction relief requested by defendant on the basis of defects in the instructions.

Defendant next contends that he was entitled to post-conviction relief on the basis that he received ineffective assistance of counsel at trial. Defendant bases his claim of ineffective assistance of counsel on the failure of trial counsel to present evidence bearing on his state of mind at the time of the shootings. Specifically, defendant maintains that his attorney should have presented the expert testimony of Dr. Ronald Baron, a psychiatrist who examined defendant prior to trial, regarding defendant's state of mind. Defendant also maintains that his attorney should have presented evidence of an incident occurring a few years prior to the shootings during which defendant was attacked and seriously injured. According to defendant this evidence explains his concern about being attacked by Gardner and Coleman.

The standard for showing a want of effective assistance of counsel stated in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, and adopted by our supreme court in *People v. Albanese* (1984), 104 Ill. 2d 504, 525-27, is that the defendant must establish that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, were it not for counsel's deficient representation, the outcome of the proceedings would have been different. (*People v. Hernandez* (1993), 246 Ill. App. 3d 243, 252, 615 N.E.2d 843, 849.) When considering a claim of ineffective assistance of counsel, we entertain a strong presumption that defendant's counsel acted within a wide range of reasonable, competent assistance. (*People v.*

*Johnson* (1989), 128 Ill. 2d 253, 266; *Hernandez*, 246 Ill. App. 3d at 252, 615 N.E.2d at 849.) A defendant cannot generally make out a claim for ineffective assistance of counsel based on his counsel's trial strategy. *People v. Shum* (1987), 117 Ill. 2d 317, 370; *Hernandez*, 246 Ill. App. 3d at 252, 615 N.E.2d at 849.

■ We first consider defendant's argument regarding the failure to utilize Dr. Baron as an expert witness. The record indicates that Dr. Baron conducted a psychiatric interview of defendant prior to trial. A report (which is in the form of a letter dated February 13, 1984, to defendant's attorney) based on the examination was submitted to the trial court in connection with sentencing proceedings. In his letter, Dr. Baron related defendant's account of the circumstances surrounding the shootings, including defendant's statement that "[h]e feared some kind of assault" at the time of the incident. Dr. Baron observed that "Mr. Denson told his story in a coherent and believable manner." Based on this letter, defendant contends that Dr. Baron should have been called to testify on his behalf. We do not believe that such testimony would be admissible. The letter reveals no basis on which Dr. Baron could have testified about defendant's state of mind other than to express his view that the defendant's own statements during the psychiatric interview were truthful. Initially we observe that while Dr. Baron's letter indicates that he found defendant's account of the incident to be believable, nothing suggests that he formed a psychiatric opinion regarding defendant's truthfulness during the interview. In context, it appears Dr. Baron's statement that he found defendant believable merely prefaces other observations in the letter, which was apparently written with sentencing issues in mind.

We recently addressed the admissibility of a psychiatrist's opinion as to the truthfulness of a criminal defendant's exculpatory statements made during a psychiatric examination in *People v. Pertz* (1993), 242 Ill. App. 3d 864, which, coincidentally, involved testimony by Dr. Baron. In *Pertz*, the defendant, who was accused of murdering his wife by striking her with a baseball bat, testified that during heated arguments with his wife he sometimes experienced blackout-like episodes that he referred to as "whiteouts" because of a visual symptom he experienced during the episodes. The defendant testified that on the evening of his wife's death they were arguing, and the defendant grabbed his wife's sleeve and threw her backwards, at which point he suffered a whiteout. He testified that when he recovered from the whiteout his wife appeared lifeless, and panicking and fearing arrest, the defendant

struck her with a baseball bat to make her death look like an accident. Dr. Baron conducted several interviews of the defendant and administered various tests, based on which Dr. Baron testified that the defendant suffered from mild hypoglycemia and a mild to moderate organic personality disorder with temporal lobe epilepsy. On appeal following his conviction, the defendant contended that the trial court erred in barring Dr. Baron's opinion regarding whether the defendant had responded honestly to questions posed by Dr. Baron during the psychiatric interviews. We found no error, observing as follows:

"The outcome of defendant's trial rested, in large part, on whether the jury believed defendant's version of the sequence of events on the night of the offense. The question of defendant's credibility was a concept within the common and ordinary understanding of the jury. If an expert's opinion does not present a concept beyond such understanding, the expert's testimony regarding a witness' credibility is properly excluded. [Citation.]

A good portion of the interviews conducted by Dr. Baron pertained to the offense itself and to defendant's account of his alleged physical conditions which existed on the night of the offense. The doctor's opinion as to defendant's honesty during the interviews would have had a direct bearing on these aspects of the interviews. His opinion would have been an expression of his belief in defendant's testimony, would have lent his professional credibility to defendant's self-serving declarations, and would have conferred upon them a legitimacy which could have unfairly affected the credibility of the case." 242 Ill. App. 3d at 900.

We also found no error in the trial court's refusal to permit Dr. Baron to testify as to the defendant's intent on the night of the offense:

"The jury heard Dr. Baron testify as to tests he conducted, the results of those tests, and his opinions concerning defendant's personality. Additionally, the doctor read to the jury the various traits characteristic of one having organic personality disorder and also testified as to the dosages of the medications defendant told the doctor he took on the date of the offense. The jury also heard the doctor express his opinion, based upon a reasonable degree of medical and psychiatric certainty, that defendant was suffering from organic personality disorder with temporal lobe epilepsy on the night of his

wife's death. It was permissible for Dr. Baron to give this opinion, but it was not permissible for him to express his opinion as to defendant's state of mind on the night of the incident.

Dr. Baron was not with defendant nor did he observe defendant on the night of his wife's death. Thus it would have been impossible for him to opine with a reasonable degree of medical and psychiatric certainty whether defendant had intended his act of hitting her in the head with a baseball bat. The doctor's testimony as to defendant's mental state was meant to show that defendant lacked the intent and that he acted recklessly. However, recklessness is not a state of mind which requires expert testimony. Whether defendant appreciated the risk involved when he killed his wife or whether he panicked were questions for the jury and not issues for testimony by an expert psychiatrist.

The question of defendant's state of mind at the time of the crime was a question of fact to be determined by the jury [citation], which was charged with taking this evidence along with all the other evidence presented to determine whether defendant had the intent to kill his wife. Allowing Dr. Baron to testify as to defendant's intent would have usurped the province of the jury." 242 Ill. App. 3d at 902-03.

We employed similar reasoning in our decision in *People v. Ambro* (1987), 153 Ill. App. 3d 1, *overruled in part on other grounds in People v. Chevalier* (1989), 131 Ill. 2d 66. In *Ambro* the defendant stabbed his wife to death after she revealed her marital infidelity, and he was convicted of murder. The defendant testified that he had no conscious knowledge of stabbing his wife and had no intent to do so. On appeal the defendant argued that the trial court erred in excluding testimony by a psychiatrist who examined the defendant after his arrest as to the defendant's mental state at the time he killed his wife. In affirming the trial court, we relied in part on *People v. Aliwoli* (1976), 42 Ill. App. 3d 1014, where the court addressed the propriety of allowing psychiatric evidence regarding the defendant's intent in an attempted murder prosecution. We noted the *Aliwoli* court's statement that " 'the testimony of the psychiatrist would not only usurp the province of the jury, but it would probably not have persuaded them in resolving such issue of fact.' " (*Ambro*, 153 Ill. App. 3d at 8, quoting *Aliwoli*, 42 Ill. App. 3d at 1021.) We also rejected the argument that the psychiatrist's testi-

mony was admissible under the principle that an expert's opinion may reach an ultimate issue of fact. We stated:

"That proposition is correct in cases where the expert testifies to facts requiring scientific knowledge not within the common knowledge of the jury. [Citations.] On the other hand, expert opinions may not be admitted on matters of common knowledge unless the subject is difficult to comprehend and explain. [Citation.] From the facts, as previously discussed, we conclude that the jury could have arrived at its decision based on its knowledge without the help of expert testimony." *Ambro*, 153 Ill. App. 3d at 8.

See also *People v. Elder* (1991), 219 Ill. App. 3d 223.

Defendant relies on *People v. Free* (1983), 94 Ill. 2d 378, in support of his argument that Dr. Baron's testimony would have been admissible. That case is readily distinguishable. *Free* involved testimony by an expert with credentials as a psychologist and a psychopharmacologist regarding whether the defendant was able to act intentionally while under the influence of alcohol and PCP. The expert in *Free* did not opine on either the actual content of the defendant's thoughts or perceptions or the defendant's truthfulness in relating his mental state. The expert's testimony related to the pharmacological effect of certain substances on the defendant's mental processes, clearly a proper subject for expert testimony.

Applying these principles, we conclude that the testimony by Dr. Baron that defendant contends should have been presented would have been inadmissible. Defendant's claim of ineffective assistance of counsel cannot be sustained on the basis of counsel's failure to offer inadmissible evidence.

Defendant also argues that trial counsel's performance was deficient because he failed to present evidence that defendant had himself been the victim of a serious violent attack a few years earlier. While the State contends, *inter alia*, that such evidence would have been inadmissible, we believe that regardless of its admissibility the decision not to present such evidence was well within the realm of sound trial strategy.

■ Defendant maintains that this evidence would have explained why he was apprehensive of further violence and would have bolstered his testimony that he feared an attack by Gardner and Coleman. Viewed with the benefit of hindsight it is theoretically possible that the evidence might have influenced the jury's choice between murder and manslaughter. However, at trial defendant relied in part on a theory of self-defense, and it is readily ap-

parent that evidence of the earlier incident could have seriously undermined this theory by suggesting to the jury that defendant's perceptions of the events preceding the shootings were distorted. The evidence would tend to portray defendant as *unreasonably* fearful and would thereby detract from his claim of self-defense. Given these considerations, the question of whether to offer such evidence was one of trial strategy, and the failure to do so does not establish ineffective assistance of counsel.

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

BOWMAN and COLWELL, JJ., concur.