THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL E. STRADER, Defendant-Appellant.

Fifth District    No. 5—94—0582

Opinion filed April 3, 1996.

878

J. William Lucco, of Edwardsville, for appellant.

William Haine, State's Attorney, of Edwardsville (Norbert J. Goetten, Stephen E. Norris, and Kendra S. Mitchell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE HOPKINS delivered the opinion of the court:

Defendant, Michael E. Strader, appeals from a verdict of guilty of the first-degree murder (720 ILCS 5/9—1 (West 1992)) of Donnell Awalt (Donnell) and the attempted first-degree murder (720 ILCS 5/8—4 (West 1992)) of Matthew Pike (Matthew). Defendant was sentenced to consecutive terms of 60 years' imprisonment on the murder charge and 30 years' imprisonment on the attempted murder charge. On appeal, we consider whether defendant was denied a fair trial by the court's refusal to allow his expert witness to testify, whether the court erred in certain other evidentiary rulings, whether the court abused its discretion in sentencing defendant to consecutive terms of imprisonment, and whether the sentences are excessive. For reasons we will more fully explain, we affirm.

## I. FACTS

The trial of this cause lasted from January 18 through January 31, 1994. The prosecution called 23 witnesses in its case in chief and seven rebuttal witnesses. Defendant called 15 witnesses. Defendant confessed murdering Donnell and shooting Matthew. The prosecution played a videotape of defendant's confession for the jury without objection from defendant. Although defendant admitted the murder and the shooting, he alleged both the intoxication defense (720 ILCS 5/6—3 (West 1992)) and the defense of "acting under a sudden and intense passion resulting from serious provocation," the second-degree murder defense (720 ILCS 5/9—2(a)(1) (West 1992)). The court instructed the jury on both the intoxication defense and on second-degree murder.

The pertinent evidence can be summarized as follows: Defendant dated Donnell for about a year and a half, until about a month before the murder, when they stopped dating on a regular basis. At the time of the shooting, defendant was 19 years old and Donnell was 18 years old. Defendant's trial witnesses testified that defendant and the victim continued to date occasionally in the month before the murder. The State's witnesses testified that the relationship ended

completely, but that defendant continued to harass and threaten the victim.

On Saturday, August 1, 1992, defendant began drinking beer at around 2 o'clock in the afternoon. That evening, he continued to drink beer as he drove around with three other young people for several hours, after which they went to the Livingston homecoming, where defendant continued to drink beer. Several witnesses who saw defendant at the homecoming testified that defendant appeared to be intoxicated; he staggered, giggled, and slurred his words. Defendant's sister felt that defendant was too drunk to drive home, so she drove him home before midnight. Sometime after defendant arrived home, he loaded a .22-calibre rifle with a clip of seven shells and loaded one of the shells into the chamber of the gun.

After defendant arrived at his house, he called Donnell. Matthew testified that he was there with Donnell when she received the call. According to Matthew, defendant yelled so loudly that Matthew overheard what defendant was saying. According to Matthew, defendant said that he was going to come over to Donnell's house to "take care of business." Donnell finally hung up the phone at Matthew's request. Shortly after the phone call, defendant arrived at Donnell's house. Matthew testified that defendant ran out of his car waving a rifle in the air. Matthew told Donnell to lock the door to her two-year-old daughter's room. Matthew went outside to talk to defendant. In the meantime, Donnell called her uncle, Tim Simmons. Simmons testified that he received a call from Donnell at 12:50 a.m. on August 2, 1992. Donnell told Simmons that defendant was at her house with a gun, and she also told Simmons, "he is going to kill us all."

According to Matthew, Donnell came outside shortly after Matthew. Donnell began arguing loudly with defendant. Matthew testified that defendant was waving the rifle in the air but had not yet fired it. Donnell told defendant that if he was going to shoot them, to go ahead and do it. She slapped defendant and knocked him to the ground. Defendant got back up and Donnell slapped him again. Donnell and Matthew turned to go inside the house. Matthew testified that defendant asked Donnell whom she would choose, Matthew or defendant. According to Matthew, Donnell turned around and said that it sure would not be defendant, because defendant always hurt her. Defendant then started shooting the rifle. Donnell was hit once in the neck and once in the back. Matthew was hit once in the neck, once in the shoulder, and once in the groin. Donnell died as a result of the bullet in her back. Matthew was treated and released from the hospital the next day but came back a few weeks later for outpatient surgery to remove a bullet.

After defendant left Donnell's house, he drove back to his house, got a .12-gauge shotgun, and reloaded the rifle. One witness testified that after defendant was arrested, he stated that the purpose of getting the shotgun and reloading the rifle was to "finish" the job. Another witness testified: "[Defendant] went home to get a .12 gauge to go back to Donnell's to finish her and Matt off and Samantha [Donnell's daughter]. By the time he got back *** there was a cop there so he kept going and went straight [to his friend's, Brian Orloski's, house]." After defendant went to Orloski's house, Orloski drove defendant to the police station, where defendant turned himself in.

Defendant was arrested and transported to the Madison County sheriff's department. Defendant was interviewed at 2:45 a.m. and gave a videotaped statement at 4:17 a.m. on August 2, 1992. Several of the law enforcement personnel who saw defendant after the shooting testified that defendant did not appear intoxicated to them. After defendant gave his videotaped statement, defendant was given two breathalyzer tests. Both tests showed that defendant had a blood-alcohol content of .15 at approximately 5:25 a.m. on August 2, 1992.

Joseph Kayich, Jr., testified that he was an inmate at the Madison County jail on August 2, 1992, and that he shared a jail cell with defendant that day and the next. Kayich testified that defendant told him that he was drinking before the shooting, but that the alcohol had nothing to do with the shooting.

One of defendant's expert witnesses, Dr. Walter Christopher Long, testified that Donnell and Matthew had blood-alcohol contents of .119 and .11, respectively, at the time of the incident. Dr. Long also calculated that defendant's blood-alcohol content at the time of the incident was probably between .22 and .24. Dr. Long testified that Donnell's blood-alcohol content would have given her a feeling of well being and a tendency to take greater risks than normal. According to Dr. Long, if defendant's blood-alcohol content were between .22 and .24 at the time of the incident, defendant's vision, balance, and hearing would have been impaired, and defendant's fine motor skills would have been impaired. Dr. Long stated that pulling the trigger of a gun is not a fine motor skill, but that hitting your target might be.

Long testified that a functioning alcoholic is one who can stand and walk with a blood-alcohol content of .20 or higher. According to Long, a functioning alcoholic can learn to do many things without appearing intoxicated, but that the central nervous system of even a functioning alcoholic will be impaired when the blood-alcohol content is over .20. Long concluded that if defendant had a blood-alcohol content of approximately .23 at the time of the incident, his power of reasoning would have been suspended. Long added that defendant's

power of reasoning would have been impaired if his blood-alcohol content were as low as .15 at the time of the incident. The court sustained an objection by the State and refused to allow Dr. Long to use a toxicology chart to show the relationship between blood-alcohol content and human conduct.

Defendant offered the testimony of a second expert witness, Dr. Larry Taliana. Dr. Taliana is a psychologist who examined defendant several times after his arrest. Dr. Taliana drafted a report that included information regarding defendant's difficulties in school and problems with his parents. If allowed, Dr. Taliana would have testified that, based upon a combination of factors, including defendant's background, his psychological makeup, and his intoxication at the time of the offense, defendant acted out of a sudden and intense passion. The trial court refused to allow Dr. Taliana to testify, based upon *People v. Elder*, 219 Ill. App. 3d 223 (1991).

## II. ANALYSIS

### A. REFUSAL TO ALLOW DEFENDANT'S EXPERT WITNESS TO TESTIFY

We now consider whether, under the circumstances of this case, defendant was denied a fair trial by the court's refusal to allow Dr. Taliana to testify. Defendant presented two affirmative defenses in his behalf, intoxication and facts which could reduce the crime from first-degree to second-degree murder if the jury found that defendant was acting under a sudden and intense passion at the time of the shooting. Dr. Long's testimony covered the defense of intoxication. Dr. Taliana's testimony would have covered the issue of whether defendant was guilty of the lesser crime of second-degree murder. We note that the trial court submitted defendant's proposed jury instruction allowing the jury to consider the question of second-degree murder, even though the court earlier barred defendant's expert witness on this point. We feel that under the circumstances of this case, the court erred by refusing to allow defendant to fully develop his second-degree murder defense. Regardless of the court's error, however, we do not find that the error deprived defendant of a fair trial.

■ The second-degree murder statute provides:

"(a) A person commits the offense of second degree murder when he commits the offense of first degree murder *** and *** the following mitigating factor[ ] [is] present:

(1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed ***[.]

***

(b) Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

(c) When a defendant is on trial for first degree murder and evidence of *** the mitigating factor[ ] *** has been presented, the burden of proof is on the defendant to prove *** [the] mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder. However, the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of first degree murder and, when appropriately raised, the absence of circumstances at the time of the killing that would justify or exonerate the killing ***." 720 ILCS 5/9—2 (West 1992).

Thus, a defendant who seeks the benefit of the second-degree murder defense has the initial burden to prove by at least a preponderance of the evidence that he was provoked into a sudden and intense passion by the person killed. If the defense is "appropriately raised," then the burden shifts back to the State to prove beyond a reasonable doubt the absence of a provocation sufficient to incite such intense passion or other circumstances which would justify a second-degree murder verdict. 720 ILCS 5/9—2 (West 1992). The posture of the case before us is somewhat unusual. The trial court refused to allow defendant's expert witness to testify about his testing and conclusions, testimony which defendant claimed would support his second-degree murder defense, but then the trial court allowed the jury to be instructed on second-degree murder, finding that the evidence of the second-degree murder defense was slight but "not based upon mere speculation."

The basis of the trial court's refusal to allow defendant's expert to testify was the *Elder* case. *Elder*, however, does not support the trial court's total bar of defendant's expert witness. *Elder*, 219 Ill. App. 3d 223. In *Elder*, the trial court allowed defendant's expert witness, a psychologist, to testify about the psychological tests he performed on the defendant and the results of those tests, all of which supported the defendant's second-degree murder defense. The trial court allowed the expert to testify as to everything except his ultimate conclusion that the defendant had acted under a sudden and intense passion resulting from serious provocation. *Elder*, 219 Ill. App. 3d at 225. The appellate court affirmed the trial court, stating:

"The question of the defendant's mental condition at the time of the crime is a question of fact to be determined by the trier of fact. [Citation.] Expert opinion may not be admitted on matters of common knowledge unless the subject is difficult to comprehend and explain. [Citation.] We find that a jury is capable of determining whether the defendant was acting under a sudden and intense

passion as a result of serious provocation." *Elder*, 219 Ill. App. 3d at 225-26.

The court in *Elder* did not restrict defendant's expert testimony on the second-degree murder defense but only prohibited the expert from stating his ultimate conclusion. Therefore, the reasoning of the *Elder* case did not require the trial court in the case at bar to deprive defendant of his right to question his expert witness on this defense. *Elder*, 219 Ill. App. 3d 223. At most, *Elder* stands for the proposition that an expert should not render an opinion as to his conclusions regarding an ultimate issue. To the extent that *Elder* conflicts with our ruling announced herein, we decline to follow it, as it is contrary to both Illinois Appellate and Supreme Court authority allowing a qualified expert to render an opinion, even as to the ultimate issue in the case. See *People v. Free*, 94 Ill. 2d 378 (1983); *People v. Rogers*, 246 Ill. App. 3d 105 (1993); *People v. LePretre*, 196 Ill. App. 3d 111 (1990).

The State argues on appeal that an expert can testify to the ultimate issue in a case, but only if the expert testimony involves "scientific knowledge which is not within the common knowledge of the jury." The State contends that Dr. Taliana's testimony would have presented only facts within the common knowledge of the jury and that his testimony was duplicitous of the intoxication testimony presented by Dr. Long. We disagree.

■ Dr. Taliana's testimony would have covered his interviews of defendant, the numerous psychological tests of defendant, and the results of those tests, as well as his conclusion that defendant was acting under a sudden and intense passion. The record belies the State's claim that Dr. Taliana's testimony would have concerned facts or knowledge commonly known to the jurors. The State did not question Dr. Taliana's qualification to testify as an expert, nor would the record support such an assertion. As a qualified, licensed psychologist, Dr. Taliana's interviews with defendant were focused upon the criteria relevant to his field of expertise. The tests he used when interviewing defendant are specialized tools designed to give the psychologist precise information regarding defendant's mental condition. While the jurors in this case may have had vast amounts of common sense about the general subject of psychology, this court is not prepared to say that the entire field of psychology is a matter of knowledge common to all.

Additionally, the State cites *People v. Denson*, 250 Ill. App. 3d 269 (1993), in support of its argument that Dr. Taliana's testimony was properly refused. *Denson*, however, does not support the State's argument. In *Denson*, the court held that the defendant's attorney provided effective assistance of counsel even though the attorney

failed to present an expert witness that could have testified about defendant's state of mind, where the expert could have expressed only that the defendant appeared truthful. *Denson*, 250 Ill. App. 3d at 278. Thus, *Denson* does not hold that the trial court should restrict expert testimony concerning psychological interviews or testing, but it holds only that a defendant is not deprived of the effective assistance of counsel if the defense attorney chooses not to call an expert to say that the defendant appeared truthful. *Denson*, 250 Ill. App. 3d 269. Defendant in the case at bar did not offer expert testimony as to defendant's credibility; consequently, *Denson* is inapposite.

■ The State argues that Dr. Taliana's proposed testimony concerned only information on intoxication, which was cumulative to the earlier testimony of Dr. Long. Again, the State's argument is not supported by the record. Dr. Long testified in support of defendant's intoxication defense. Dr. Taliana would have testified as to defendant's second-degree murder defense. The intoxication defense (720 ILCS 5/6—3 (West 1992)) is wholly separate from a second-degree murder defense (720 ILCS 5/9—2 (West 1992)). Each defense shifts the burden of proof to the accused, but each requires a different factual basis. Moreover, Dr. Taliana's proposed testimony concerned defendant's background, his psychological profile, and the manner in which that background and profile contributed to defendant's loss of control at the time of the offense. Dr. Long testified only to the effects of alcohol upon defendant and the victims. As such, the testimony of the two experts was not duplicitous, and the trial court should not have barred Dr. Taliana's testimony on that basis.

Finally, the State argues that Dr. Taliana's testimony was properly barred for the reason that his testimony would have provided defendant only an unrecognized "hybrid partial defense." The only categories of serious provocation which have been recognized for second-degree murder are: substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse. *People v. Tenner*, 157 Ill. 2d 341, 371 (1993). Additionally, mere words, gestures, or trespasses to property do not amount to the kind of serious provocation contemplated by the statute. *Tenner*, 157 Ill. 2d at 371.

■ The State is correct that Dr. Taliana's testimony did not fit into any of these categories. Donnell's slapping and shoving of defendant did not amount to substantial physical injury or assault, as defendant sustained no injury from her behavior. There is no question that Donnell was not illegally arresting defendant and that she was not his spouse.

In addition, Donnell's slapping and shoving of defendant did not

amount to a mutual quarrel or combat, since Donnell was unarmed, and defendant came to her home armed with a loaded rifle. One who instigates a quarrel or fight cannot rely on the victim's response as evidence of mutual combat. *People v. Austin*, 133 Ill. 2d 118 (1989). Clearly, there could have been no quarrel whatsoever if defendant had not come to Donnell's home, particularly since defendant came armed with a loaded gun. The crime is first-degree murder where the defendant attacks the victim with violence all out of proportion to the provocation, especially where the homicide is committed with a deadly weapon. *Austin*, 133 Ill. 2d at 127.

If allowed, Dr. Taliana would have testified only about defendant's problems in the past and how his alcoholism and intoxication decreased his ability to control his anger when Donnell provoked him. Therefore, even if Dr. Taliana had testified and the jury had believed everything he said, there was no evidence of any provocation which the law recognizes as reasonable and adequate. *Austin*, 133 Ill. 2d at 125. Although the trial court erred in barring Dr. Taliana's testimony, and although we strongly criticize the court's restriction of defendant's case, the error does not entitle defendant to a new trial in light of the overwhelming evidence of guilt.

For all of the reasons stated, defendant's conviction and sentence are affirmed.

Affirmed.

MAAG and GOLDENHERSH, JJ., concur.