NO. 4-03-0343

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

DANIEL E. RAINES,

Defendant-Appellant.

)

)

)

)

)

)

)

)

Appeal from

Circuit Court of

Macon County

No. 01CF762

Honorable

Timothy J. Steadman,

Judge Presiding.

JUSTICE MYERSCOUGH delivered the opinion of the court:

In November 2002, a jury found defendant, Daniel E. Raines, guilty of three counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2000)).  Defendant was sentenced to death.  In December 2002, defendant filed a posttrial motion, arguing the trial court erred when it barred expert testimony regarding defendant's state of mind at the time of the murder.  The court denied the motion, and defendant filed his appeal on December 24, 2002, with the Supreme Court of Illinois.  Thereafter, on January 10, 2003, then-Governor George Ryan commuted defendant's death sentence to a sentence of imprisonment for natural life.  By order dated April 8, 2003, the Supreme Court of Illinois transferred defendant's appeal to this court.  We affirm.

I. BACKGROUND

In June 2001, defendant was charged by information with three counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2000)), alleging defendant shot Vermilion County deputy sheriff Myron Deckard while Deckard was performing his official duties and transporting defendant to the Vermilion County jail.  

On September 25, 2002, defendant filed a supplemental discovery disclosure, indicating his intent to call Dr. Ruth Kuncel, a licensed clinical psychologist, as a witness.  Dr. Kuncel's psychological report was attached to the disclosure.  Dr. Kuncel's report stated she interviewed defendant, reviewed a litany of documents, and administered 12 tests (Wechsler Adult Intelligence Scale-III, Trailmaking A and B, major portions of the Delis-Kaplin Executive Function System, Stroop Color and Word Test, Figure Recall subtest of the Repeatable Battery for the Assessment of Neurological Status, Brown ADD Scales, Validity Indicator Profile, the Minnesota Multiphasic Personality Inventory-2, 16PF- Fifth Edition, Rorschach, Thematic Apperception Test, and the Rotter Incomplete Sentence Blank, Adult).

According to the clinical-observations/mental-status section of the report, Dr. Kuncel found as follows:

"[Defendant] was alert and oriented, with no obvious motor deficits observable to casual observation.  He exhibited the capacity to attend and concentrate in a normal manner.  [Defendant] was socially appropriate with [Dr. Kuncel] throughout the evaluation.  [Defendant] was observed in disagreement with jail personnel, but his behavior was within normal limits.  [Defendant] presented with no obvious memory or language deficits to casual observation.  No misperceptions were observed or reported.  While appearing to be of at least average general intelligence, his thinking style was notable for its linearity and inflexibility.  That is, he seemed to go from 'A' to 'B' with limited capacity for entertaining alternative hypotheses, causative relationships, or consequences.

[Defendant] presented as anxious, shy, reactive, energetic, and depressed, with modest social skills, although covering his discomfort variously with a veneer of excessive emotional control and/or some bravado.  For example, his face can be comparatively expressionless and he may speak with comparatively flat affect and minimal inflection[,] when, on closer observation, he is quite upset."

Further, according to the report, the shooting was the result of incidents that happened earlier on the day of June 5, 2001.  On that day, defendant appeared in the trial court on a revoked-license charge.  While there, he was told of an outstanding warrant in Vermilion County.  Unable to post bond, defendant was being transferred to Vermilion County.  Deckard was the officer transporting defendant.  According to the report, during the drive to Vermilion County, defendant

"concluded that if he reached Danville, he would be kept in jail there for a sufficiently long period of time [during which] that he would lose everything.  [Defendant] needed to get out of [the squad] car and go home so he would not lose his family life.  *** [Defendant] slipped out of the restraints[,] and the encounter with the officer followed."

The report further stated that after "the encounter," defendant hitchhiked a ride and then took a taxicab before he reached the home of his ex-wife.  Once there, defendant drank some beer, spent time with his ex-wife, and then walked to the police department in the middle of the night to report the incident.

Dr. Kuncel's report concluded as follows:

"[Defendant]'s purpose in exiting the police car, consistent with his perception of his circumstances, his psychological makeup, and his cognitive style, was to go home and keep his personal affairs in order with no desire to do serious harm to the police officer.  Subsequently, in the dark and rain, still focused on his initial goal, while consciously frightened, anxious, physiologically distressed, and in a high state of autonomic arousal, at least in part, in response to the officer's reported discharge of the pistol, [defendant] pulled the trigger of the gun."

Dr. Kuncel's conclusion was based on her findings that defendant was "prone to be insecure, emotionally needy, shy, anxious, and socially ill at ease."  Dr. Kuncel further opined that defendant possessed "a self-contained, rigid, concrete, and goal-directed thinking style that generally impedes his ability to think abstractly or flexibly in unstructured situations, leaving him *** often unaware of the possible consequences of his actions or of how others might interpret said [actions]."

On September 27, 2002, the State filed a motion 
in
 
limine
 seeking to bar Dr. Kuncel's testimony, arguing (1) defendant provided no notice of his intent to put forth a defense of insanity, intoxication, or other mental disease and (2) Dr. Kuncel's opinion that defendant did not intend to shoot Deckard should not be allowed into evidence as expert testimony.

On October 17, 2002, a hearing was held on the State's motion 
in
 
limine
.  Upon direct examination by the State, Dr. Kuncel testified that, given her understanding of the terms, defendant had a mental disease or defect.  Upon further questioning, Dr. Kuncel stated that defendant possessed "deficits in his thinking abilities."  Dr. Kuncel did not find evidence of schizophrenia or evidence to support a legal insanity defense.  Dr. Kuncel determined defendant possessed a high-average intelligence, and Dr. Kuncel found defendant's memory intact.

Upon questioning by the State about her interview of defendant as detailed in her report, Dr. Kuncel stated that she spoke with defendant about his state of mind when he hit Deckard with the baton, struggled with Deckard, and then shot him.  Dr. Kuncel and defendant also discussed how defendant felt when he pulled the trigger.  When asked by the State to identify the details of that part of the interview in the report, Dr. Kuncel responded that it was contained in her one-sentence summary, "He slipped out of the restraints[,] and the encounter with the officer followed."  Dr. Kuncel felt the statement provided sufficient detail for the purposes of the report.

During cross-examination by defense counsel, Dr. Kuncel read into the record the conclusion from her report, opining that defendant did not intend to shoot Deckard.  Dr. Kuncel further testified about defendant's mental deficits, consistent with the findings in her report.  

On redirect, Dr. Kuncel agreed that the essence of her opinion was that defendant "didn't mean *** to hurt [Deckard] because he didn't really think through what he was doing."  Dr. Kuncel further testified that when defendant shot Deckard, "his mind was a garble[.] *** It was all blurred together."  Dr. Kuncel admitted that her opinion that defendant's mind was "garbled" was her interpretation of defendant's explanation of the shooting.  Defendant's actual explanation to Dr. Kuncel for why he shot Deckard was essentially, "I don't know what happened."

By docket entry dated October 18, 2002, the trial court granted the State's motion 
in
 
limine
, barring Dr. Kuncel from testifying to defendant's state of mind at the time of the shooting.  The court found such testimony would not be of assistance to the jury because it concerned matters of common knowledge.  In response to a motion to clarify, the court stated that it would allow Dr. Kuncel to testify to "the psychological tests she conducted, her conclusions regarding *** defendant's thought process and personality type[,] and her conclusions regarding how persons with those characteristics would think under stressful situations."

At trial, the State presented a certified copy from the Vermilion County circuit court, indicating defendant's outstanding warrant was for failure to appear for a traffic citation for the offense of driving with a revoked license.  The State then called Wilbur Moore, a retired afternoon jailer for the Montgomery County sheriff's department, who testified that he was on duty the evening of June 5, 2001, when Deckard arrived to transfer defendant to Danville.  Defendant was in handcuffs and a restraint belt.

Orville Miller, an inmate in the Montgomery County jail  on June 5, 2001, testified that he was present when defendant was being prepared for transfer to Vermilion County.  Miller heard defendant complain to Deckard that the handcuffs were too tight and cutting off his circulation.  Miller testified that Deckard then loosened the handcuffs.  Miller stated that after Deckard adjusted the handcuffs, they were very loose.

Jeremy Litz also testified for the State.  Litz stated that at approximately 11 p.m. on June 5, 2001, defendant knocked on the door of his residence.  Litz's residence is located in rural Macon County between Argenta and Cisco.  Defendant told Litz he needed to get to Carlinville because his wife was giving birth and his brother had left him without a ride after the two got into a fight.  Litz told defendant he would not take him all the way to Carlinville, but he agreed to take him to a truck stop, the Oasis, a few miles away from the house.  Litz stated defendant seemed nervous but not upset.  During the ride to the truck stop, they talked about hunting, and defendant offered Litz a 9-millimeter pistol if Litz would agree to take him all the way to Carlinville.  Litz declined and dropped defendant off at the Oasis.

Annabelle Long, who resides near Route 48 in rural Macon County, testified that at approximately midnight on June 5, 2001, defendant rang the doorbell at her home.  Long answered the door and then awakened her husband before talking further to defendant.  Defendant was not upset or emotional.  Defendant wanted to go to Carlinville because his wife was in labor, and he asked Long to drive him as far as Springfield.  Long declined, but she offered to call a taxicab to take him, and Long gave defendant $60 to pay for the ride.  Long was unaware defendant had thrown a gun into her bushes until the police searched her yard the next morning.

Ryan Fuoss, an Illinois State Police trooper, testified that at approximately 5 a.m. on June 6, 2001, he was informed by Sergeant Kirsten Nash that a man had confessed to killing an officer on Interstate 72 near the rest area.  Fuoss was dispatched to attempt to locate Deckard's car.  Fuoss located Deckard's car and checked to see if Deckard was still alive.  Finding no pulse, Fuoss returned to his squad car and notified dispatch of the situation.  Fuoss and another officer then secured the area.  Fuoss also searched the area and discovered a restraint belt.

Illinois State Police special agent Mark Peyton testified that he found both a Glock handgun and a gun magazine in the bushes at the Long residence.  Illinois State Police crime investigator Michael Trummel testified that he retrieved the Glock .40-caliber handgun in the bushes located at 3381 Boyd Road, which is the Longs' residence.  Sean Carson, manager of Ray O'Herron's Company Police Supply Equipment, testified that Deckard purchased a Glock .40-caliber handgun on February 21, 1991, with serial number RZ409, which matched the serial number of the gun retrieved at the Long residence.

Sabrina Raines, defendant's ex-wife, also testified for the State.  According to Sabrina, she attempted to secure the $300 needed to post defendant's bond for the outstanding Vermilion County warrant, but she was unsuccessful.  Before going to work at 4 p.m. on June 5, 2001, Sabrina told defendant she had not secured the $300.  Sabrina further told defendant she would find a way to post bond either that night or early the next morning.

After returning from work that night, defendant called Sabrina at approximately 12:38 a.m. on June 6, 2001, and asked her to pick him up at the Shell station at the Interstate 55 Carlinville exit.  Sabrina refused, but she agreed to meet defendant at a motel in Carlinville.  Sabrina met defendant and gave him money to pay the extra fare the taxicab charged for bringing defendant beyond Springfield and to Carlinville.  Sabrina and defendant went to Sabrina's home, where defendant drank three beers and the two had sexual intercourse.  Sabrina noticed defendant's heart was racing, and she asked defendant what was wrong.  Defendant initially said nothing but then told her of the events earlier in the night.  Sabrina stated she became hysterical and told him he should turn himself in to the police.  Defendant then took two beers and left the house.  Defendant called Sabrina later that morning and told her he was at the Macoupin County jail.

Mary Wong, an Illinois State Police forensic scientist, testified that she found unique and consistent particles characteristic of gunshot residue in the sample taken from defendant's left hand.  Wong concluded that defendant discharged a firearm, came in contact with a primer gunshot-residue-related item, or his left hand was in the vicinity of a discharged firearm.  Wong also tested the shirt defendant was wearing on the night of June 5, 2001, and concluded that the shirt was in the vicinity of a discharged firearm. 

Dr. Travis Lee Hindman, a physician pathologist specializing in forensic pathology, testified for the State.  Dr. Hindman testified that, based upon his training and the autopsy, Deckard died from brain trauma due to a gunshot wound to the left temporal region.

Carlinville police office Christopher Lee Rogers testified that on the morning of June 6, 2001, defendant told Rogers of the incident with Deckard.  According to Rogers, defendant stated he was in the process of being transported to Vermilion County when he decided he did not want to go back to prison.  Defendant was also angry that Deckard would not let him smoke in the car.  Defendant stated that he pushed the handcuffs up to his elbow area and maneuvered the restraint belt so that he could extend his arms far enough to reach Deckard's baton.  Defendant then struck Deckard in the head.  Following a struggle, defendant told Rogers that "he pointed the gun at [Deckard's] head and shot him."  Defendant further told Rogers that he walked to the nearest farmhouse, threw the magazine under one bush, and threw the handgun under another bush in the front yard of the home.  Rogers's testimony was corroborated by Carlinville police officer Kevin Naugle and Macoupin County deputy sheriff Gary Ewin.  The State then rested.

Defendant called Dr. Kuncel to testify, who testified about the tests she administered to defendant and the mental defects or deficits each test is designed to identify.  Dr. Kuncel testified, consistent with her report, that defendant is shy, anxious, prone to feel "put upon," and defendant does not feel good about himself.  Dr. Kuncel found the mental deficiencies were of a "substantial magnitude" in defendant's personality.  Dr. Kuncel explained that the deficiencies resulted in defendant having difficulty entertaining alternatives and looking at consequences.  Dr. Kuncel testified that defendant possessed an A to B tunnel-vision quality to his thinking and defendant had a limited ability to organize and understand unstructured situations.  Dr. Kuncel further testified that in individuals with personality and thinking deficits like defendant's, stress further decreases that person's thinking process and ability to consider alternatives and consequences.  Therefore, that person's reaction in a high-level stress situation is magnified, creating "an even greater sense of fear, panic, [and] emotional reaction," which can result in a loss of conscious control.  Finally, Dr. Kuncel testified that persons with defendant's personality and thinking deficiencies are "more likely to react with ineffective, inefficient, inappropriate, inadequate responses that are not under conscious control" when subjected to a stressful situation.

On cross-examination, Dr. Kuncel testified that, in her opinion, defendant's mental deficits constituted a mental "disease."  However, Dr. Kuncel did not specify what that mental disease was.  Dr. Kuncel stated defendant possessed an average to high-average intelligence quotient.

Defendant testified on his own behalf.  Defendant testified about difficulties growing up with his mother and step-father, who had five children from a previous marriage.  Defendant did not feel like part of the family.  When defendant married his ex-wife, Sabrina, he felt like part of a family.  Defendant was especially close to Sabrina's daughter, Caley.  Defendant worked for Plumber Construction and owned a mobile home, cars, and pets.  Defendant was paying all of his bills and making payments on his debts.

Defendant testified that in August 2000, he experienced legal problems.  Defendant moved from one part of Carlinville to another, and, as required, defendant notified his parole agent within 24 hours.  However, defendant's move was seen as a parole violation, and defendant spent approximately 60 days in the Department of Corrections.  Following a hearing before the parole board, defendant was cleared of any parole violation.  After defendant's release, he and Sabrina experienced marital problems, defendant nearly lost his home, bills piled up, and defendant lost his job.

In the spring of 2001, defendant learned that Sabrina was seeing another man.  Defendant left Carlinville and spent a month in Danville with friends "partying."  Defendant returned to Carlinville because of concern for Caley.  Defendant moved back in with Sabrina, who had moved in with her mother.  Defendant got a job and was making arrangements to move the family into a home.  On May 28 or 29, 2001, defendant learned that Sabrina obtained a divorce from defendant.

On June 5, 2001, defendant appeared in trial court in Hillsboro for driving on a revoked license and driving without proof of insurance.  Sabrina drove defendant to court that day.  While there, defendant was told that he had an outstanding warrant in Vermilion County and would be taken to the jail after his appearance before the judge that day.  Defendant needed $300 to post bond, and Sabrina was to make arrangements to pay it.  However, Sabrina did not post his bond, and defendant was frustrated.  At approximately 9 p.m., Deckard arrived to transport defendant to Vermilion County.  Prior to being transferred, defendant changed into his own clothes and was handcuffed.  Defendant complained of the handcuffs being too tight, and the officer loosened the handcuffs.

After getting in the car, Deckard set his gun on the dashboard of the car.  As they were traveling north on Interstate 55, they passed the Carlinville exit, and defendant was thinking about how "Sabrina never did come bond me out[,] and I was going to jail, I was going to lose my job, everything I just worked to regain."  Defendant testified he "decided I was going to go home."

Defendant testified he looked around the squad car and saw Deckard's baton standing on end between the two front seats.  Defendant thought he could use the baton to "knock [Deckard] out and let the car crash and get out and go."  Defendant did not think about the consequences of his plan.  Defendant pushed the handcuffs far up on his arm and unbuckled his restraint belt.  Deckard turned on the light in the car at one point and asked defendant what he was doing.  Defendant told Deckard, "nothing," and that was the end of that incident.

Defendant testified that he grabbed the baton and brought it into the backseat, where he stood it up between his feet and legs.  Defendant then waited "to get the courage" to hit Deckard.  Defendant waited until it was raining very hard, and he made sure there were no headlights coming toward the car or coming from behind the car.  Feeling they were in a remote area, defendant swung the baton, which hit the headrest and then bounced and hit Deckard in the head.  Deckard was not knocked unconscious.  Deckard reached for defendant in the backseat, and a struggle followed.  Defendant then "slipped" in between the front seats and grabbed the steering wheel, all while continuing to struggle with Deckard.  The car slid through the grass and rolled before stopping.

Defendant and Deckard continued to struggle.  Defendant noticed the driver's side front car window was gone, and he decided to exit through it because he "wasn't getting no where" in his struggle with Deckard.  Defendant exited the car through the window and started to stand up when he noticed Deckard leaning forward to grab something from the floorboard of the car.  Defendant saw the object come out of the window and determined it was a gun.  Defendant, still in handcuffs, leaned over and pushed the gun against the side of the car, saying, "I quit, I'm done, I'm done."  While defendant had his hands around Deckard's hand, which was holding the gun, the gun discharged.  Defendant gripped his hands, pulled backward, and ended up holding the gun.  

Defendant stated that he then told Deckard to give him the keys to remove the handcuffs and Deckard started to comply.  According to defendant, Deckard then reached across his body, and defendant believed Deckard was reaching for a can of Mace.  Defendant told Deckard to stop, but Deckard reached again.  Defendant decided he would reach into the car and get the keys himself.  Defendant reached in the car, and Deckard grabbed his hand.  Defendant was trying to pull himself back out of the car, and Deckard was trying to hold on to him.  Defendant again believed Deckard was going to spray him with Mace, so "[a]s I was pulling the rest of the way back outside the car, I fired the gun."

Defendant testified that he had the gun pointed in Deckard's general direction but he never meant to fire the gun.  After shooting Deckard, defendant reached into the car and retrieved the keys to the handcuffs.  As defendant was trying to remove the handcuffs, he noticed the brake lights on the car were on.  Defendant reached into the car and removed Deckard's foot from the brake pedal.  Defendant then walked toward the interstate.  While walking, defendant removed and discarded the handcuffs and restraint belt.

Defendant stated that he approached a house with lights on and asked the occupant, Litz, to give him a ride to Springfield.  Litz told defendant he would not drive him to Springfield, but Litz did agree to give him a ride to a truck stop down the road.  From the Oasis, defendant walked along Interstate 72 to another home where defendant saw lights.  When he reached that home, he threw the gun into one flower bed and the magazine into another.  Defendant knocked on the door and asked the resident for a ride to Springfield.  The couple living in the home, the Longs, did not want to drive defendant to Springfield, but they called a taxicab to take defendant.  When the taxi arrived, the couple gave defendant $60 to pay for the ride.  Defendant told both Litz and the Longs that he needed the ride because he had been in a car with his brother, who left him when defendant got out of the car to use the bathroom. 

Defendant took the taxi to a motel in Carlinville, where Sabrina met him.  Sabrina gave defendant $40 to pay for the extra distance the taxi drove beyond Springfield to Carlinville.  Defendant and Sabrina went to the apartment of Sabrina's mother, where Sabrina was living at the time.  At the apartment, defendant drank at least three beers before he went to bed.  Defendant and Sabrina had sexual intercourse.  Later, defendant told Sabrina what he had done and stated that he needed to turn himself in to the police.

Defendant took two more beers and left the apartment to walk to the police station.  Defendant arrived at the police station around 3:30 a.m. and told the dispatcher that he needed to report an incident.  Defendant waited approximately 20 minutes before speaking to two Carlinville police officers.  Defendant told the officers he struck and shot an officer while being transported to Danville.  Defendant also reported the incident to State Police Sergeant Langhiem when he arrived at the police station.

On cross-examination, defendant testified that before walking away from the car, defendant retrieved his wallet, cigarettes, and lighter.  Defendant admitted telling Litz that he had a pregnant wife who was about to give birth to convince Litz to give him a ride to the truck stop.  Defendant further acknowledged that he did not ask Litz, the Longs, the taxi driver, or Sabrina to call an ambulance to check on Deckard.

In rebuttal, the State introduced certified copies of defendant's previous convictions for unlawful possession of a weapon by a felon, disorderly conduct, driving with a revoked license with a prior conviction for same, theft over $300, unlawful restraint, and aggravated battery.

The jury found defendant guilty and further found the existence of statutory aggravating factors to support imposition of the death penalty.

In December 2002, defendant filed a posttrial motion, arguing the trial court erred when it barred Dr. Kuncel's testimony regarding defendant's state of mind at the time of the shooting.  The court denied defendant's motion, and this appeal followed.

II. ANALYSIS

A. Standard of Review

"The decision whether to admit expert testimony, including the expert's qualifications and whether the testimony will assist the trier of fact in understanding the evidence, rests within the sound discretion of the trial court."  
People v. Reatherford
, 345 Ill. App. 3d 327, 341, 802 N.E.2d 340, 353 (2003), citing 
Kleiss v. Cassida
, 297 Ill. App. 3d 165, 174, 696 N.E.2d 1271, 1277 (1998).  "The trial court's decision on the admissibility of an expert's opinion will not be reversed on appeal unless 'the error was prejudicial or the result of the trial was materially affected.'"  
Reatherford
, 345 Ill. App. 3d at 341, 802 N.E.2d at 353, quoting 
Turner v. Williams
, 326 Ill. App. 3d 541, 553, 762 N.E.2d 70, 81 (2001).

B. The Trial Court Did Not Err In Excluding

Dr. Kuncel's Testimony Regarding Defendant's Mental State

Defendant argues the trial court erred when it granted the State's motion 
in
 
limine
 barring Dr. Kuncel's testimony that defendant did not intend to shoot the victim.  We disagree.

To convict defendant of first degree murder, the State was required to prove beyond a reasonable doubt at least one of the following:  defendant (1) intended to kill or do great bodily harm to Deckard, (2) knew his acts would cause death or great bodily harm to Deckard, or (3) knew his acts created a strong probability of death or great bodily harm to Deckard.  See 720 ILCS 5/9-1(a)(1), (a)(2) (West 2000).  At trial, defendant attempted to present testimony from Dr. Kuncel to establish that he did not intend to kill Deckard, an ultimate issue in the case.  
 "[A] witness, whether expert or lay, may provide an opinion on the ultimate issue in a case.  [Citation.]  This 
is so because the trier of fact is not required to accept the witness'[s] conclusion and, therefore, such testimony cannot be said to usurp the province of the jury."  
People v. Terrell
, 185 Ill. 2d 467, 496-97, 708 N.E.2d 309, 324 (1998), citing 
Richardson v. Chapman
, 175 Ill. 2d 98, 107-08, 676 N.E.2d 621, 625 (1997).  Nonetheless, 
it is proper to allow expert testimony only where such testimony is needed to explain matters beyond the common knowledge of ordinary persons, and the testimony will help the fact finder in reaching a conclusion.  
People v. Wood
, 341 Ill. App. 3d 599, 608, 793 N.E.2d 91, 100 (2003), citing 
People v. Gilliam
, 172 Ill. 2d 484, 513, 670 N.E.2d 606, 619 (1996).  Therefore, "expert testimony is not admissible on matters of common knowledge unless the subject is difficult to understand and explain."  
Gilliam
, 172 Ill. 2d at 513, 670 N.E.2d at 619, citing 
Hernandez v. Power Construction Co.
, 73 Ill. 2d 90, 98-99, 382 N.E.2d 1201, 1205 (1978).

The trial court barred Dr. Kuncel from testifying to defendant's state of mind when he shot Deckard, finding defendant's state of mind was a matter of common knowledge.  On appeal, defendant does not argue that Dr. Kuncel's testimony was necessary to explain matters beyond the common knowledge of ordinary persons.  Rather, defendant argues that his state of mind at the time of the crime was relevant to the issue of whether he intended to kill Deckard, and therefore, Dr. Kuncel's testimony would have assisted the jury. 

"The question of [a] defendant's state of mind at the time of the crime [is] a question of fact to be determined by the jury."  
People v. Pertz
, 242 Ill. App. 3d 864, 903, 610 N.E.2d 1321, 1346 (1993), citing 
People v. Elder
, 219 Ill. App. 3d 223, 225, 579 N.E.2d 420, 421 (1991).  "
Mental states, such as the intent to kill or to cause great bodily harm, are not commonly established by direct evidence and may be inferred from the character of the defendant's conduct and the circumstances surrounding the commission of the offense."  
People v. Adams
, 308 Ill. App. 3d 995, 1006, 721 N.E.2d 1182, 1190 (1999), citing 
People v. Summers
, 202 Ill. App. 3d 1, 10, 559 N.E.2d 1133, 1138 (1990).

The trial court's bar of Dr. Kuncel's specific testimony that defendant did not intend to shoot was not an abuse of discretion.  Dr. Kuncel's testimony was not offered in support of any asserted defense by defendant, 
e.g.
, insanity, and defendant did not argue that the testimony was necessary to explain evidence beyond the common knowledge of the jury.  Therefore, the court correctly barred Dr. Kuncel's testimony regarding defendant's state of mind at the time of the crime.  Consequently, however, we fail to see the relevance of any of Dr. Kuncel's testimony and question whether the court should have allowed Dr. Kuncel's testimony at all.  Regardless, the court did not abuse its discretion.

In reaching our decision, we reject the Fifth District's holding in 
People v. Strader
, 278 Ill. App. 3d 876, 663 N.E.2d 511 (1996).  In 
Strader
, the State charged the defendant with first degree murder (720 ILCS 5/9-1 (West 1992)).  The defendant asserted as a mitigating factor that he was acting under "'a sudden and intense passion resulting from serious provocation,'" which, if proved, could result in a finding of second degree murder.  
Strader
, 278 Ill. App. 3d at 878, 663 N.E.2d at 512, quoting 720 ILCS 5/9-2(a)(1) (West 1992).  At trial, the defendant attempted to introduce the expert testimony of a psychologist, who would have testified that, based upon the defendant's background, psychological makeup, and intoxication at the time of the crime, the defendant acted out of a sudden and intense passion.  
Strader
, 278 Ill. App. 3d at 881, 663 N.E.2d at 514.  
The trial court completely barred the psychologist's testimony, relying on 
Strader
, 278 Ill. App. 3d at 882, 663 N.E.2d at 514, and 
Elder
, 219 Ill. App. 3d 223, 579 N.E.2d 420.

On appeal, the Fifth District Appellate Court found the trial court erred in barring the psychologist's testimony.  In reaching its decision, the 
Strader
 court misstated the State's and the defendant's burdens under the second degree murder statute.  

The 
Strader
 court correctly cited the second degree murder statute, which stated as follows:

"'(a) A person commits the offense of second degree murder when he commits the offense of first degree murder *** and *** the following mitigating factor[] [is] present:

(1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed ***[.]

* * *

(b) Serious provocation is conduct sufficient to excite an intense passion in a reasonable person. 

(c) When a defendant is on trial for first degree murder and evidence of *** the mitigating factor[ ] *** has been presented, the burden of proof is on the defendant to prove *** [the] mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder.  However, the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of first degree murder and, when appropriately raised, the absence of circumstances at the time of the killing that would justify or exonerate the killing ***.'"  
Strader
, 278 Ill. App. 3d at 881-82, 663 N.E.2d at 514, quoting 720 ILCS 5/9-2 (West 1992).

Interpreting the statute, the 
Strader
 court found that the defendant had "the 
initial
 
burden
 to prove *** that he was provoked into a sudden and intense passion by the person killed."  (Emphasis added.)  
Strader
, 278 Ill. App. 3d at 882, 663 N.E.2d at 515.  The 
Strader
 court further found, however, that "[i]f the defense is 'appropriately raised,' 
then the burden shifts back to the State to prove beyond a reasonable doubt the absence of a provocation sufficient to incite such intense passion or other circumstances which would justify a second[]degree murder verdict
. 720 ILCS 5/9-2 (West 1992)."  (Emphasis added.)  
Strader
, 278 Ill. App. 3d at 882, 663 N.E.2d at 515.  This interpretation of the statute is erroneous.

However, contrary to 
Strader
, the second degree murder statute does not shift the burden back to the State to prove the lack of "sudden and intense passion resulting from serious provocation."  720 ILCS 5/9-2(a)(I) (West 1992).  Rather, the statute emphasizes the State's burden to prove all the elements of first degree murder, even when the defendant asserts a second degree murder defense.  See 720 ILCS 5/9-2(c) (West 1992).  While the statute does shift the burden of proof to the State to prove, if appropriately raised, the "absence of circumstances at the time of the killing that would justify or exonerate the killing" (720 ILCS 519-2(c) (West 1992)) (
i.e.
, the absence of self-defense), the defendant in 
Strader
 did not raise self-defense.  Therefore, the 
Strader
 court's shifting of the burden to the State to prove the absence of "'sudden and intense passion resulting from serious provocation'" (
Strader
, 278 Ill. App. 3d at 881, 663 N.E. 2d at 514, quoting 720 ILCS 5/9-2(a)(1) (West 1992)) is a misinterpretation of the second degree murder statute.

The 
Strader
 court then found that the psychologist's testimony was directly relevant to the defendant's defense that he was acting under a sudden and intense passion at the time of the crime, and therefore, the trial court erred in completely barring the psychologist's testimony.  
Strader
, 278 Ill. App. 3d at 881, 663 N.E.2d at 514.  Nonetheless, the 
Strader
 court later concluded that the error was harmless in light of the overwhelming evidence of guilt and because, "even if [the psychologist] had testified and the jury had believed everything he said, there was no evidence of any provocation which the law recognizes as reasonable and adequate."  
Strader
, 278 Ill. App. 3d at 885, 663 N.E.2d at 517. 

We find these two conclusions
 to be legally inconsistent.  According to 
Strader
, the trial court erred in barring the psychologist's testimony regarding sudden and intense passion, even though the 
Strader
 court found no evidence of serious provocation.  Yet, "sudden and intense passion" and "serious provocation" are 
both
 elements the defendant had the burden to prove under the second degree murder statute.  Lacking any proof of provocation, we fail to see what relevance the psychologist's testimony would have provided to the jury.  For these reasons, we decline to follow 
Strader
.  

Additionally, we distinguish 
People v. Free
, 94 Ill. 2d 378, 447 N.E.2d 218 (1983), cited by defendant in support of his argument that psychological testimony should be allowed to establish defendant could not act intentionally at the time of the crime.  In 
Free
, the defendant sought to have the trial court instruct the jury on toxic psychosis in support of his defenses of insanity and voluntary intoxication.  
Free
, 94 Ill. 2d at 403, 447 N.E.2d at 230.  The defendant argued that on the night of the crime, he consumed beer, smoked a marijuana cigarette, and smoked a mint leaf soaked in phencyclidine compound (PCP).  
Free
, 94 Ill. 2d at 404, 447 N.E.2d at 230.  The defendant argued that as a result of his use of PCP, he had no recollection of the events that occurred around the time of the crime and he was unable to act intentionally.

At trial, the State presented expert testimony from a witness who was both a psychologist and psychopharmacologist ("one who specializes in
 
the study of the effects of drugs on behavior and usually is trained in psychology, pharmacology, medicine, neurology, chemistry, and related disciplines").  
Free
, 94 Ill. 2d at 410-11, 447 N.E.2d at 233-34.  The trial court limited the expert's testimony to whether the defendant had the ability to act intentionally at the time of the crime while under the influence of PCP.  
Free
, 94 Ill. 2d at 409, 447 N.E.2d at 233.  On appeal, the 
Free
 court found the jurors had a limited understanding of PCP and its effects on the user, and therefore, the expert's testimony was necessary for matters beyond the common knowledge or experience of the jurors.  
Free
, 94 Ill. 2d at 411, 447 N.E.2d at 234.  Therefore, the 
Free
 court found the trial court properly admitted the expert's testimony.

In the instant case, defendant was not under the influence of any hallucinogenic drug, and the trial court specifically found that Dr. Kuncel's testimony was not necessary to explain matters beyond the common understanding and knowledge of the jury. 
 Therefore, we find 
Free
 distinguishable and decline to apply it to the facts here.    

III. CONCLUSION

The trial court did not abuse its discretion by granting the State's motion 
in
 
limine
 barring Dr. Kuncel from testifying to defendant's state of mind at the time of the shooting.

Affirmed.

STEIGMANN and APPLETON, JJ., concur.