**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230160-U

Order filed November 1, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-23-0160 Circuit No. 17-CF-634 |
| RICHARD E. JACKLIN, | ) ) ) | The Honorable Kathy S. Bradshaw-Elliott, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE McDADE delivered the judgment of the court.
Justices Hettel and Davenport concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:   The circuit court did not err when it barred certain evidence at the defendant's trial for aggravated criminal sexual assault, criminal sexual assault, and sexual misconduct. Further, the evidence was sufficient to prove the defendant guilty beyond a reasonable doubt, and his 18-year sentence was not excessive.

¶ 2     The defendant, Richard Jacklin, was convicted of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(6) (West 2016)) and was sentenced to 18 years of imprisonment. On appeal, Jacklin argues that (1) the circuit court erred when it barred the introduction of evidence regarding his ability to understand the nature of his actions at the time of the incident, (2) the circuit court

erred when it barred evidence related to R.A.'s ability to consent, (3) the State failed to prove him guilty beyond a reasonable doubt, and (4) his 18-year sentence was excessive. We affirm.

¶ 3                                     I. BACKGROUND

¶ 4         Richard Jacklin was a chaplain assigned to the Shapiro Developmental Center, a State-operated facility for intellectually disabled adults. On October 31, 2017, Jacklin placed his mouth on the penis of one of the facility's residents, R.A. The act was observed by another Shapiro Developmental Center employee, and Jacklin did not dispute that the sexual act occurred.

¶ 5         In December 2017, Jacklin was indicted on charges of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(6) (West 2016)), criminal sexual assault (*id.* § 11-1.20(a)(2) (West 2016)), and sexual misconduct (*id.* § 11-9.5(b)(1)). The indictment generally alleged that Jacklin placed his mouth on R.A.'s penis. Counts I and II alleged that Jacklin knew or should have known that R.A. was unable to understand the nature of the act or was unable to give knowing consent, with count I adding that R.A. was a handicapped person. Count III alleged that Jacklin was an employee of a State-operated facility and R.A. was a person with a disability who was under the care and custody of the Department of Human Services at a State-operated facility.

¶ 6         During pretrial matters, Jacklin filed a motion *in limine* that sought to admit evidence of R.A.'s sexual history, which appeared in records from the Shapiro Developmental Center. In particular, the motion alleged that R.A. had a history of sexual aggression toward other people in that (1) he was admitted to a facility in 1995 after he was found unfit to stand trial for sexually abusing his two-year-old nephew, (2) he self-reported forcing two 13-year-old girls to have sex with him, (3) he sexually assaulted a young boy in his neighborhood, (4) he sexually assaulted his eight-year-old niece in 1997, (5) after being transferred to the Shapiro Developmental Center, a target issue to be addressed was R.A.'s inappropriate sexual behavior, which included exposing

2

himself, making sexual comments, and attempting to engage in sexual intercourse with individuals who were vulnerable and/or susceptible to suggestion, and (6) he had exposed himself in public. Further, the motion alleged that R.A. had been diagnosed with Paraphilia NOS and Sexual Abuse of a Child as Predator, and that he was subject to a behavior intervention program at the Shapiro Developmental Center to address his inappropriate sexual behavior and physical aggression. The motion argued that this evidence was relevant to the question of whether R.A. could consent to the sexual act.

¶ 7　　　　The circuit court's initial ruling on Jacklin's motion was to exclude the evidence because it violated section 115-7(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7(a) (West 2016)), colloquially known as the "rape shield" statute. The court stated it would potentially reconsider its ruling regarding the evidence of R.A.'s aggressive behavior and his paraphilia diagnosis. Ultimately, the court stated that it would potentially reconsider its rulings on some of the motion's purported evidence after hearing offers of proof.

¶ 8　　　　During discovery, the defense tendered a report compiled by Dr. Robert Shapiro, who completed a psychological examination of Jacklin. Dr. Shapiro noted that he was retained because Jacklin's "attorneys want an understanding of why this devout religious man would conduct himself in this fashion."

¶ 9　　　　Dr. Shapiro's report summarized Jacklin's background, which included being ordained a Catholic priest in 1984 and being hit by a car in 1986, which resulted in Jacklin suffering a traumatic brain injury. Following his recovery, the Catholic Church changed Jacklin's assignments several times. Ultimately, he was assigned to the Shapiro Developmental Center in 1998.

¶ 10　　　　Jacklin told Dr. Shapiro that R.A. would routinely " 'push himself' " on Jacklin in a sexual manner. After three or four months of this behavior, Jacklin stated he " 'just gave up' and did what he wanted.' "

¶ 11　　　　Dr. Shapiro opined that Jacklin "was and is an asexual person having no interest or desire." In support of his opinion, Dr. Shapiro noted that Jacklin expressed never having any notable sexual desire, and his only two sexual experiences were with other priests who pressured him into the encounters. Jacklin stated he eventually gave in to the pressure, but he did not find the experiences arousing at all. Dr. Shapiro concluded that the encounter with R.A. was similar, as he eventually gave in to R.A., "hoping that would be the end of the demands."

¶ 12　　　　Dr. Shapiro also administered several psychological tests, leading him to conclude that Jacklin, among other things, exhibited signs of depression, low self-esteem, and memory issues. His myriad psychological issues worsened after suffering a traumatic brain injury. Dr. Shapiro also noted that Jacklin had been diagnosed with "dementia of a mild severity" in 2018.

¶ 13　　　　Dr. Shapiro noted that during the interview process, Jacklin struggled to find words at times and had difficulty staying focused on topic. He opined that Jacklin's depression and dementia had worsened over time. He concluded, "[t]here is no evidence in his history or the psychological testing of emotional dysregulation, emotional instability or a propensity for assault."

¶ 14　　　　The State filed a motion *in limine* to exclude Dr. Shapiro's testimony. The State argued that Dr. Shapiro's report was irrelevant and speculative. Further, the State argued that expert testimony related to Jacklin's fitness to form the requisite criminal intent, mental state, or fitness to stand trial was inappropriate. The State also added that "[t]he Jury will not be helped by having to wade through Expert opinions that shed no light on whether or not the Defendant committed the charged offenses." The circuit court granted the State's motion in August 2022.

¶ 15    A jury trial was held in September 2022. R.A. testified and exhibited difficulty answering questions at times. He said he did not know when his birthday was, but then said it was on Christmas day. He was 35 years old and, with some direction, was able to agree that he lived at the Shapiro Developmental Center. He had a job there that involved sorting silverware. When he was shown a picture of Jacklin and asked who was in the picture, R.A. said, "I really don't like him." He did not want to say Jacklin's name and added, "he did something bad to me." R.A. stated, "he raped me." When the prosecutor asked what Jacklin did, R.A. said, "[w]ell, could I stand up and show you?" The prosecutor responded, "how about if I ask a different question? Okay."

¶ 16    The prosecutor showed R.A. a picture of a room and asked if something happened with Jacklin in that room. R.A. said yes and that "he was hitting on me and raping me." R.A. clarified that "he was pulling his pants down and standing up and he was putting his whole dick in me." A discussion ensued after the jury was taken out of the courtroom, the result of which was an agreement by both sides that the conduct R.A. mentioned did not happen. The prosecutor then asked R.A. if Jacklin put his mouth on R.A.'s penis. R.A. said yes and that he did not want Jacklin to do so. He also denied pushing Jacklin down.

¶ 17    R.A. struggled to answer many questions asked of him on cross-examination, including if he knew what sex was and whether he knew if there were different kinds of sex. Also, regarding the incident with Jacklin, R.A. stated that Jacklin ripped all of his clothes off and that he was not wearing a shirt or pants when one of the facility's workers walked into the room. He also said that he pushed Jacklin down. The following exchange occurred next:

"[Defense counsel]. Okay. And then he put his mouth on your penis?

A. Yeah. And I tell him to get -- could I say it my way?

THE COURT: You can answer his question.

5

A. Okay. I tell him to get the fuck up out of here. If he don't --

[Defense counsel]: Q. You complained that he was biting too hard?

A. Yeah.

Q. But it was okay before that?

A. No. I tell him no because if he don't I -- I gonna have somebody come after him."

R.A. added that Jacklin pulled him into the room, that he knew what was going to happen in the room, and that he did not want to go into the room because "that ain't me."

¶ 18 Upon further questioning, R.A. nodded affirmatively when asked if he unzipped the fly on his pants when he pushed Jacklin down. However, he also nodded affirmatively when asked if that happened after Jacklin ripped off all his clothes. R.A. then agreed that neither he nor Jacklin had any clothes on.

¶ 19 On redirect, the prosecutor asked R.A. why he pushed Jacklin down. R.A. responded, "[b]ecause he got no right telling me what to do. He telling me to suck his dick." The prosecutor then asked if R.A. pushed Jacklin down "so that he could suck your dick." R.A. said no.

¶ 20 Aprill Spates, an employee of the Shapiro Developmental Center, testified that she was working on the day of the incident. While walking toward the television room on R.A.'s floor, she saw the soles of Jacklin's shoes. As she got closer, she observed R.A. standing in the room, facing the door, and Jacklin kneeling in the room, facing R.A. She said Jacklin was performing oral sex on R.A., "bobbing his head back and forth." She was able to "holler" and R.A. and Jacklin separated. R.A.'s entire midsection was exposed. Jacklin stood up, tucked his body backwards, and zipped up his pants. Shortly thereafter, the unit director came to the floor and asked Jacklin if the accusation was true. Spates then said, "he said yes. And then he made some mention about he

6

keeps bothering me. Every time I come over here he keeps bothering me. And the unit director told him that he's supposed to report it and tell somebody. That's not an excuse."

¶ 21 The State also called Dr. Rita Pavate, an expert in internal medicine, to the stand. Dr. Pavate worked at the Shapiro Developmental Center and had examined R.A. in February 2017. She testified that R.A. had a seizure disorder and left-side hemiparesis, both of which constituted physical handicaps. The left-side hemiparesis affected only his gait.

¶ 22 The registered nurse who examined R.A. after the incident testified that when she asked R.A. what happened, "[h]e told me that prior to coming to the emergency department he was with the church man at the place where he lived and that the church man had sucked his dick." She then performed a full medical forensic exam of R.A., which included swabbing his penis. On cross-examination, the nurse admitted that in her medical record of the exam, she had noted that R.A. told her "he wanted to do it with him" and that "I wanted to suck his dick, but he told me to go to the TV room and then I got pissed he bit my dick." On redirect, the nurse stated that R.A. was admitted to the hospital as a part of a safety plan because he said he did not feel safe going back to the facility.

¶ 23 A stipulation was entered that the swabs from R.A.'s genitals contained Jacklin's genetic material.

¶ 24 Dr. Hany Girgis testified as an expert in clinical psychology. He worked at the Shapiro Developmental Center and performed evaluations of R.A. in 2010 and 2019. R.A.'s intelligence quotient (IQ) was scored as 47 in 2010, which, at that time, fell within the 44- to 60-range for moderate intellectual disability. He described that range as including people who likely could not read or write, had difficulty carrying on conversations, had very low reasoning ability, and needed assistance with day-to-day living. The age equivalent of a person with an IQ of 47 was eight to

7

nine years old. Further, R.A.'s independence level, or adaptive behavior functioning, in 2010 was that of a 5½-year-old. A diagnosis of intellectually disabled required deficiencies in both intellectual functioning and adaptive behavior functioning; R.A. possessed both. In 2019, R.A. scored a 42 on an IQ test, which was an insignificant difference from his prior score of 47. His independence level in 2019 was that of a child six years and four months old.

¶ 25    Chaquana Means, a behavior analyst working for the Shapiro Developmental Center, testified that she saw R.A. almost daily and was responsible for creating his behavior-intervention plan. She detailed his typical day, adding that while he could dress himself, he needed assistance with choosing seasonally appropriate clothes. He could brush his teeth and feed himself, but supervision and assistance from staff was needed. His behavior-intervention plan included a positive reinforcement system wherein he would earn stars for appropriate behavior and then receive rewards, such as Pop-Tarts and notebooks. Means also testified that R.A. would make sexual comments at times, but she did not personally observe him ever direct those comments at anyone.

¶ 26    While several of the State's witnesses were testifying, the circuit court allowed offers of proof so it could finalize its ruling on Jacklin's motion *in limine* regarding R.A.'s sexual history. Generally, none of the offers of proof revealed personal knowledge of R.A. engaging in inappropriate sexual behavior with other people. Rather, the offers of proof revealed in general that the Shapiro Developmental Center's behavior-intervention plan for R.A. was based on older records from a previous facility; *i.e.*, hearsay. Additionally, Dr. Gigris' diagnosing of R.A. as having paraphilia NOS was based solely on his review of records from the Shapiro Developmental Center, as he did not have access to the older facility's records and therefore did not review them. Ultimately, the circuit court denied Jacklin's motion in full.

8

¶ 27        The State also introduced the video recording of Jacklin's interview by police on the day of the incident. In the video, Jacklin described the services he performed at the facility, which, using his special-education degree, included putting homilies into the proper format for the residents. He also stated that the residents in the facility had physical and cognitive disabilities.

¶ 28        Regarding R.A., Jacklin told the police that R.A. acted like a troublemaking seventh-grade child. He also admitted that he went to R.A.'s floor that day specifically to correct R.A.'s inappropriate sexual behavior; he believed that if he performed oral sex on R.A., the behavior would cease. Jacklin also expressed doubt that R.A. understood either what correct sexual behavior was or that Jacklin's act was intended to correct inappropriate behavior.

¶ 29        After the State rested, the circuit court addressed the defense's attempt to admit Dr. Shapiro's report into evidence. The court refused to admit the report into evidence, ruling in part that diminished capacity was not the law in Illinois pursuant to *People v. Hulitt*, 361 Ill. App. 3d 634 (2005), and that a case cited by the defense, *People v. Valdez*, 2022 IL App (1st) 181463 (plurality opinion), was not valid law because it had not yet been released for publication. The court also ruled that expert testimony was not necessary to explain depression and low self-esteem to the jury.

¶ 30        The jury returned guilty verdicts on all three counts. Jacklin filed a motion for new trial, which raised four issues: (1) the circuit court erred when it denied Jacklin's request to introduce evidence relevant to his mental state at the time of the offense, (2) the court erred when it limited the defense's ability to cross-examine Dr. Girgis regarding R.A.'s paraphilia NOS diagnosis and his inappropriate sexual behavior, and when it denied Jacklin's motion *in limine* to admit evidence of R.A.'s sexual history, (3) the court erred when it denied certain jury instructions proposed by

9

the defense, and (4) the court erred when it denied Jacklin's motion for a directed verdict. The circuit court denied the motion after a hearing.

¶ 31 At sentencing, the circuit court noted that the three counts would merge and that Jacklin was eligible to be sentenced on a Class X felony with a range of 6 to 30 years of imprisonment. The defense called Dr. Shapiro, who testified in accord with the aforementioned report he compiled. Tony Taschetta, a Catholic priest who knew Jacklin, also testified. Taschetta provided some detail on the differences in Jacklin after he had his accident, mostly related to his inability to stay on topic and hold normal conversation.

¶ 32 In aggravation, the circuit court noted that Jacklin "was in a position of trust and supervision and authority" and that deterrence was applicable "for any priest that thinks they are gonna get by with it." The court then sentenced Jacklin to 18 years of imprisonment.

¶ 33 After Jacklin's motion to reconsider sentence was denied, he appealed.

¶ 34 II. ANALYSIS

¶ 35 Jacklin's first argument on appeal is that the circuit court erred when it barred the introduction of evidence regarding his ability to understand the nature of his actions at the time of the incident. Specifically, he refers to the court's exclusion of Dr. Shapiro's testimony. Jacklin claims that the court's sole basis for excluding Dr. Shapiro's testimony was that the defense of diminished capacity is not recognized in Illinois.

¶ 36 We review a circuit court's decision on the admission of evidence for an abuse of discretion. *People v. Lerna*, 2016 IL 118496, ¶ 23.

¶ 37 Initially, we note that the circuit court primarily relied on *Hulitt* when it rejected Dr. Shapiro's testimony. It is true that *Hulitt* has been cited many times for its holding that diminished capacity is not recognized as an affirmative defense in Illinois. See, *e.g.*, *People v. Frazier*, 2019

10

IL App (1st) 172250, ¶ 35. However, *Hulitt* has been criticized for improperly conflating an affirmative defense with evidence seeking to disprove an element of the charged crime in *People v. Valdez*, 2022 IL App (1st) 181463, ¶¶ 115-23, which the circuit court in this case refused to consider because it had not been released for publication at the time of Jacklin's trial. In *Valdez*, the authoring justice[1] acknowledged that diminished capacity is not recognized as an affirmative defense in Illinois. *Id.* ¶ 121. However, the *Valdez* author pointed out that in the case before it, as well as in *Hulitt*, at issue was *evidence* being presented, not the assertion of an affirmative defense. *Id.* The *Valdez* author continued:

> "The truth is, *Hulitt* and its progeny aside, Illinois has been silent on the question of whether a defendant may offer evidence of a mental or emotional impairment to rebut *mens rea.* Our supreme court has not opined on the subject in a published decision. There is nothing within the Criminal Code of 2012 or the Code of Criminal Procedure of 1963 that contains such an evidentiary rule or, for that matter, even mentions the phrase "diminished capacity." And the Illinois Rules of Evidence are likewise silent on this specific topic." *Id.* 123.

¶ 38 After further discussion, the *Valdez* author rejected *Hulitt*'s reasoning (*id.* ¶ 131) and stated that "the admissibility of mental-deficiency evidence to rebut *mens rea*" should be decided under the Rules of Evidence (*id.* ¶ 138). The author concluded:

> "Nothing would stop the General Assembly from passing a statute barring, allowing, or limiting the use of mental-state evidence at trial to negate *mens rea.* Likewise, our supreme court could adopt a rule of evidence, or issue a judicial opinion, on this subject.

---

[1] *Valdez* was a plurality opinion, as the two specially concurring justices disagreed with various aspects of the authoring justice's analysis. Accordingly, we refer to the *Valdez* decision as the analysis of the authoring justice.

But until any of those things happen, we should not force trial judges into guesswork about whether certain mental-state testimony can be shoehorned into an undefined category of 'diminished capacity.' Instead, psychological or other testimony that is offered to negate the required *mens rea* element of an offense should be addressed like any other expert testimony, or any other piece of evidence, offered in a criminal case in Illinois. As the law currently stands, we should no longer employ this 'diminished capacity' terminology and let the Illinois Rules of Evidence, and trial judges, do their jobs." *Id.* ¶ 140.

¶ 39　　We find the *Valdez* author's reasoning persuasive, in part because our supreme court has cited *Valdez* with approval, albeit in a different context:

"Reliance on a defendant's state of voluntary intoxication, therefore, is now a question of admissibility under the Illinois Rules of Evidence, rather than its recognition as an affirmative defense. See generally *People v. Valdez*, 2022 IL App (1st) 181463, ¶ 116 ("Whether a doctrine is recognized as an affirmative defense is an entirely different question from whether certain evidence is admissible to disprove an element of the charged crime under the facts of a particular case."). *People v. Grayer*, 2023 IL 128871, ¶ 24.

¶ 40　　We note, however, that the circuit court's reliance on *Hulitt* in this case was not necessarily fatal to its decision to reject Dr. Shapiro's testimony. See, *e.g.*, *Valdez*, 2022 IL App (1st) 181463, ¶ 142. After all, we may affirm on any basis supported by the record. *Id.*

¶ 41　　It is the trier of fact's responsibility to determine what an accused's state of mind was at the time he or she allegedly committed a crime. *People v. Raines*, 354 Ill. App. 3d 209, 220 (2004). "Mental states *** are not commonly established by direct evidence and may be inferred from the character of the defendant's conduct and the circumstances surrounding the commission of the offense." *Id.*

12

¶ 42    "In Illinois, generally, an individual will be permitted to testify as an expert if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion." *People v. Enis*, 139 Ill. 2d 264, 288 (1990); see also *Lerna*, 2016 IL 118496, ¶ 23. "Expert testimony addressing matters of common knowledge is not admissible 'unless the subject is difficult to understand and explain.' " *Id.* (quoting *People v. Becker*, 239 Ill. 2d 215, 235 (2010)). These principles have been codified into Illinois Rule of Evidence 702 (eff. Jan. 1, 2011).

¶ 43    Our review of Dr. Shapiro's report reveals that he discussed Jacklin's mental health issues, which included depression and low self-esteem, as well as his finding that Jacklin suffered from mild dementia, merely in light of his conclusion that Jacklin was an asexual person. We find that Dr. Shapiro's expert testimony was unnecessary to understand these health issues and their potential impact on Jacklin's mental state at the time of the incident with R.A. See *Lerna*, 2016 IL 118496, ¶ 23 (holding that "expert testimony is only necessary when the subject is both particularly within the witness's experience and qualifications and beyond that of the average juror's, and when it will aid the jury in reaching its conclusion"); see also Ill. R. Evid. 702 (eff. Jan. 1, 2011). We emphasize that what was at issue in this case was Jacklin's mental state at the time of the crime— namely, whether he knew that R.A. was unable to either (1) understand the nature of the act or (2) give knowing consent. 720 ILCS 5/11-1.20(a)(2) (West 2016). Additionally, the charged crime required the State to prove that an act of "sexual penetration" occurred, not an act constituting "sexual conduct." The difference is significant—the latter requires the accused to have performed the act for the purpose of his or her sexual gratification, while the former does not require that purpose. 720 ILCS 5/11-0.1 (West 2022) (defining "sexual conduct" and "sexual penetration"). Dr. Shapiro's conclusions that Jacklin "was and is an asexual person having no interest or desire"

13

and that he merely acquiesced to sexual demands made by R.A. were irrelevant to Jacklin's mental state at the time of the crime as charged. See Ill. Rs. Evid. 401-03 (eff. Jan. 1, 2011).

¶ 44    Under the unique circumstances of this case, we hold that Dr. Shapiro's testimony was properly excluded under the Rules of Evidence. We also reject Jacklin's largely undeveloped claim that the circuit court's exclusion of Dr. Shapiro's testimony violated his right not to testify. He cites no law[2] in support of his claim, and we have found none.

¶ 45    Under the circumstances of this case, we hold that the circuit court did not abuse its discretion when it excluded Dr. Shapiro's testimony.

¶ 46    Jacklin's second argument on appeal[3] is that the circuit court erred when it barred evidence related to R.A.'s ability to consent. Specifically, Jacklin references the evidence he sought to introduce that was based on records from the Shapiro Developmental Center regarding R.A.'s sexual history. Jacklin claims that the "rape shield" statute did not prohibit this evidence and that matters such as R.A.'s diagnosis of Paraphilia NOS were part of his mental health condition, not his sexual history. He argues that this evidence was relevant to whether he could consent to and understand sexual acts.

¶ 47    Again, we review a circuit court's decision on the admission of evidence for an abuse of discretion. *Lerna*, 2016 IL 118496, ¶ 23.

¶ 48    Section 115-7(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7(a) (West 2016))—the "rape shield" statute—provides, in relevant part, that in prosecutions for criminal sexual assault and aggravated criminal sexual assault, "the prior sexual activity or the reputation

---

[2] We do note that Jacklin's argument does contain a general citation to *Harris v. New York*, 401 U.S. 222 (1971). However, that case does not stand for the proposition for which Jacklin cites it.

[3] We have combined into one issue what Jacklin presents in his appellant's brief as two issues related to the circuit court's exclusion of evidence related to R.A.'s sexual history. The arguments are interrelated.

14

of the alleged victim \*\*\*is inadmissible except (1) as evidence concerning the past sexual conduct of the alleged victim \*\*\* with the accused when this evidence is offered by the accused upon the issue of whether the alleged victim \*\*\* consented to the sexual conduct with respect to which the offense is alleged; or (2) when constitutionally required to be admitted." The "rape shield" statute is intended in part to ensure the jury's attention focused on issues relevant to the sexual contact with the defendant. *People v. Sandoval*, 135 Ill. 2d 159, 180 (1990) (quoting *People v. Ellison*, 123 Ill. App. 3d 615, 626 (1984)).

¶ 49 Our review of the record reveals no error in the circuit court's exclusion of the evidence related to R.A.'s sexual history. In fact, Jacklin's arguments on this issue point to no actual error in the court's reasoning, but instead reflect that he simply disagrees with the court's conclusions. Here, the court engaged in a thorough consideration of Jacklin's motion several times over the life of the case, which included allowing several offers of proof at trial. We find no error in the circuit court's application of the "rape shield" statute on this issue, including the inapplicability of the two exceptions in the statute, as well as its consideration of hearsay and relevancy. Because Jacklin has not presented any persuasive argument as to how the circuit court's decision was erroneous, we hold that the court did not abuse its discretion when it excluded Jacklin's evidence.

¶ 50 Jacklin's third argument on appeal is that the State failed to prove him guilty beyond a reasonable doubt.

¶ 51 When facing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 52 In relevant part, section 11-1.30(a)(6) of the Criminal Code of 2012 provides that "[a] person commits aggravated criminal sexual assault if that person commits criminal sexual assault and *** the victim is a person with a physical disability." 720 ILCS 5/11-1.30(a)(6) (West 2016). In relevant part, "[a] person commits criminal sexual assault if that person commits an act of sexual penetration and *** knows that the victim is unable to understand the nature of the act or is unable to give knowing consent." *Id.* § 11-1.20(a)(2).

¶ 53 There are two ways in which an individual can commit criminal sexual assault: (1) "to knowingly have sexual relations with someone who is unable to understand the nature of the act" (*People v. Whitten*, 269 Ill. App. 3d 1037, 1042 (1995)), and (2) "to knowingly have sexual relations with someone who, for any reason, is unable to give knowing consent" (*id.*). The State charged Jacklin with both ways of committing criminal sexual assault.

¶ 54 Jacklin is incorrect that the only evidence the State introduced regarding his knowledge at the time of the incident was that he knew R.A. was in the Shapiro Developmental Center. The evidence included more than just Jacklin's knowledge that R.A. was in the facility; he discussed the limited abilities of the residents, including R.A., during his interview with police. He expressed that R.A. generally acted like a troublemaking seventh-grade child and that he doubted R.A. understood correct sexual behavior. Further, Jacklin's comments to police that he intended to "correct" R.A.'s inappropriate sexual behavior indicated that he knew R.A. was incapable of understanding the oral-sex act.

¶ 55 Viewing the evidence in the light most favorable to the State, we hold that the evidence in this case was sufficient for a rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt. See *Collins*, 106 Ill. 2d at 261.

¶ 56 Jacklin's fourth argument on appeal is that his 18-year sentence was excessive.

16

¶ 57    "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. We review a defendant's sentence for an abuse of discretion. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). "[A] sentence within statutory limits will be deemed excessive and the result of an abuse of discretion by the trial court where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000).

¶ 58    Here, Jacklin was convicted of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(6) (West 2016)) in that he committed criminal sexual assault against a person with a physical disability. This offense is a Class X felony (*id.* § 11-1.30(d)(1)) for which the sentencing range was 6 to 30 years of imprisonment (730 ILCS 5/5-4.5-25(a) (West 2016)). Jacklin's sentence of 18 years was within the available range and is therefore presumptively appropriate. See *Stacey*, 193 Ill. 2d at 210.

¶ 59    Jacklin contends that his sentence constituted an abuse of discretion because (1) he had no criminal history, (2) he had served the community as a priest for his entire life, and (3) his accident affected his mental condition and therefore rendered him less culpable. This argument does nothing more than ask us to reweigh the factors, which is not our role on review. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46 (holding that "a reviewing court will not reweigh the factors in reviewing a defendant's sentence and may not substitute its judgment for the trial court merely because it could or would have weighed the factors differently").

¶ 60    We also note that Jacklin further alleges that the circuit court improperly considered a factor in aggravation that was inherent in the offense—namely, that he was in a position of trust over R.A. This argument is without merit. Aggravated criminal sexual assault (720 ILCS 5/11-

17

1.30(a)(6) (West 2016)) contains no such factor inherent in the offense as it was charged in this case.

¶ 61 Under the circumstances of this case, we hold that the circuit court's sentencing decision was not an abuse of discretion.

¶ 62 For the foregoing reasons, the judgment of the circuit court of Kankakee County is affirmed.

¶ 63 III. CONCLUSION

¶ 64 The judgment of the circuit court of Kankakee County is affirmed.

¶ 65 Affirmed.